HERCULES, INCORPORATED, a corporation of the State of Delaware, Plaintiff Below, Appellant,

v.

AIU INSURANCE COMPANY, et al., Defendants Below, Appellees.

and

American Home Assurance Company, Allstate Insurance Company (as successor to Northbrook Excess and Surplus Insurance Company and Northbrook Insurance Company), Everest Reinsurance Company (formerly known as Prudential Reinsurance Company), Gibraltar Casualty Company, and the Home Insurance Company, Defendants–Below Appellees/Cross–Appellants,

v.

Hercules, Incorporated, Plaintiff Below Appellant/Cross–Appellants.

No. 193, 2000.

Supreme Court of Delaware.

Submitted: April 23, 2001.
Decided: Aug. 15, 2001.

Corroon LLP, Wilmington, Delaware; Of Counsel: Michael F. Rettig, Esquire, of Hercules Incorporated, Wilmington, Delaware; Jerold Oshinsky, Esquire (argued), Mark H. Kolman, Esquire, Kent T. Withycombe, Esquire, and Michael T. Sharkey, Esquire, of Dickstein, Shapiro Morin & Oshinsky, Washington, D.C., Attorneys for Hercules Incorporated.

Anthony G. Flynn, Esquire (argued), and Timothy Jay Houseal, Esquire, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Of Counsel: James P. Schaller, Esquire (argued), Robert E. Rider, Esquire, and Kristan M. Campbell, Esquire, of Jackson & Campbell, Washington, D.C., Attorneys for AIU Insurance Company, American Home Insurance Company, Granite State Insurance Company, Landmark Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, and Allianz Insurance Company.

Carmella P. Keener, Esquire of Rosenthal, Monhait, Gross & Goddess, P.A.; Of Counsel: Christopher T. Lutz, Esquire (argued), of Steptoe & Johnson LLP, Washington, D.C., Attorneys for The Home Insurance Company.

Robert J. Katzenstein, Esquire, and Laurence V. Cronin, Esquire, of Smith Katzenstein & Furlow, Wilmington, Delaware; Of Counsel: Stephen D. Cuyler, Esquire, Anne M. Mohan, Esquire, and Eric Konecke, Esquire, of Cuyler Burk, Parsippany, New Jersey, Attorneys for Allstate Insurance Company, Everest Reinsurance Company and Gibraltar Casualty Company.

Michael J. Goodrick, Esquire, of Michael J. Goodrick, P.A., Wilmington, Delaware; Of Counsel: Hallie Miller Fahey, Esquire, of Meckler Bulger & Tilson, Chicago, Illi-

Richard E. Poole, Esquire (argued), Gregory A. Inskip, Esquire, and John E. James, Esquire, of Potter Anderson &

nois, Attorneys for Zurich Insurance Company.

Barbara A. Fruehauf, Esquire, of Cattie & Freuhauf, Wilmington, Delaware; Of Counsel: Stuart L. Peacock, Esquire, of Gilberg & Kiernan, Washington, D.C., Attorneys for Argonaut Insurance Company.

John A. Balaguer, Esquire, of White & Williams, Wilmington, Delaware; Of Counsel: David P. Donovan, Esquire and Nancy L. Manzer, Esquire, of Wilmer Cutler & Pickering, Washington, D.C., Attorneys for Century Indemnity Co.

Loreto P. Rufo, Esquire, of The Bayard Firm, Wilmington, Delaware, Attorney for Employers Mutual Casualty Company and Federal Insurance Company.

Kevin F. Brady, Esquire, of Skadden Arps Slate Meagher & Flom LLP, Wilmington, Delaware; Of Counsel: Irene A. Sullivan, Esquire, and Timothy G. Reynolds, Esquire, of Skadden Arps Slate Meagher & Flom LLP, New York, New York, Attorneys for General Reinsurance Corporation.

Daniel P. Bennett, Esquire, of Heckler Frabizzio & Durstein, Esquire, Wilmington, Delaware; Of Counsel: Clay H. Phillips, Esquire, and David N. Larson, Esquire, of Bollinger Ruberry & Garvey, Chicago, Illinois, Attorneys for International Surplus Lines Insurance Company.

J.R. Julian, Esquire, of J.R. Julian, P.A., Wilmington, Delaware; Of Counsel: Edward D. Shoulkin, Esquire, of Taylor Duane Barton & Gilman, Boston, Massachusetts, Attorneys for Unigard Security Insurance Company.

Francis J. Murphy, Esquire and Jonathan L. Parshall, Esquire, of Murphy Spadaro & Landon, Wilmington, Delaware; Of Counsel: John G. McAndrews, Esquire, Dean J. Vigliano, Esquire, Matthew G. Dineen, Esquire, and Allen R. McKay, Esquire, of Mendes & Mount, LLP, New York, New York, Attorneys for Amicus Curiae London Market Insurers.

Before VEASEY, Chief Justice, HOLLAND and STEELE, Justices.

VEASEY, Chief Justice.

This appeal involves an insurance coverage dispute in which the insured seeks coverage under a number of policies for tens of millions of dollars of environmental liability it has incurred. Rulings of the trial court interpreting provisions of the insurance contracts at issue resulted in a Final Judgment Order granting partial coverage to the insured. Upon review of these rulings, we affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion. Our partial reversal is based on our holding that the trial court erred in applying pro rata allocation to determine the extent of the insurers' liability in this case. We affirm the rulings of the trial court in all other respects. The remaining issues raised in this appeal are summarized below.

### Procedural Background

Plaintiff Hercules, Inc., filed an action in Superior Court against 43 of its insurers seeking coverage for costs incurred in connection with environmental actions involving twenty manufacturing sites across the country. After several years of discovery, a facility in Jacksonville, Arkansas was selected as a test case for trial in the Superior Court.

A three-month trial was held in Superior Court. The rulings on appeal are encompassed in a series of opinions issued by the Superior Court before and after trial. These are: (1) a Summary Judgment

Opinion;[1] (2) a Post–Trial Opinion;[2] (3) a bench ruling on a motion in limine; and (4) a Post, Post–Trial Opinion.[3] These rulings and the jury verdict culminated in a Final Judgment Order issued by the Superior Court on August 31, 1999.[4]

Hercules initially sought coverage from excess insurance policies purchased from 1960–1980.[5] As a result of pollution exclusions contained in certain policies and the jury's findings premised on those exclusions, only policies issued between 1964–1970 (which do not contain pollution exclusions) provide coverage. Accordingly, the Final Judgment Order imposed liability on The Home Insurance Company ("Home"), the American Home Assurance Company ("American Home"),[6] and the London Market Insurers ("LMI").[7] Because of the nature of the issues on appeal and the fact that certain insurers have settled with Hercules, only certain insurers are involved in this appeal. Specifically, Hercules' appeal concerns those non-settling insurers that sold policies to Hercules during July 31, 1963 through October 31, 1970 and July 31, 1973 through April 1, 1980.[8]

### Facts

Hercules purchased the Jacksonville site from Reasor Hill, Inc., in 1961. Reasor Hill had used the plant for the manufacture of agricultural pesticides and herbicides. Hercules continued to manufacture herbicides until 1964, at which time it began to manufacture Agent Orange under a contract with the United States government. Manufacture of Agent Orange ceased in 1968. In 1971, Hercules leased the plant to Transvaal Corporation. In 1976 Transvaal was reorganized as Vertac Corporation, which then purchased the site from Hercules, ending Hercules' involvement with the site. Throughout this period and continuing until 1986, Transvaal and then Vertac continued production of herbicides.

Operations at the Jacksonville site have resulted in extensive environmental pollu-

1. *Hercules v. Aetna Cas. & Surety Co.,* Del.Super., C.A. Nos. 92C–10–105, 90C–FE–195–1 (consolidated) (Jan. 14, 1998) [Summary Judgment Opinion].

2. *Hercules v. Aetna Cas. & Surety Co.,* Del.Super., C.A. Nos. 92C–10–105, 90C–FE–195–1 (consolidated), 1998 WL 962089 (Sept. 30, 1998) [Post–Trial Opinion].

3. *Hercules v. Aetna Cas. & Surety Co.,* Del.Super., C.A. Nos. 92C–10–105, 90C–FE–195–1 (consolidated) (Oct. 19, 1998) [Post, Post–Trial Opinion].

4. *Hercules v. Aetna Cas. & Surety Co.,* Del.Super., C.A. Nos. 92C–10–105, 90C–FE–195–1 (consolidated), (Aug. 31, 1999) [Final Judgment Order].

5. Hercules does not challenge rulings excluding coverage under pre–1960 and post–1980 policies.

6. The trial court selected September 30, 1997, as the cutoff date for "past costs." Under the trial court's declaratory judgment ruling American Home is liable for costs incurred after Sept. 30, 1997 because, based on the trial court's rulings, coverage under the American Home policy attaches at a point above the pre-cutoff damages calculated in the Final Judgment Order. *See* Final Judgment Order, at 6, 10, 12.

7. LMI has settled, but has filed an *amicus curiae* brief in this appeal arguing that we should affirm the trial court in several respects.

8. As to the 1963–1964 policies, Hercules appeals the trial court's ruling interpreting a pollution exclusion contained in those policies. As to the 1973–1980 policies, Hercules argues that the pollution exclusion to which those policies follow form is void and unenforceable because it was not filed with the Delaware Insurance Commissioner. As to the 1963–1964 policies, which do provide coverage under the Final Judgment Order, Hercules raises several issues concerning the amount of coverage.

tion and damage to the site and nearby areas. "Leaks, spills, drum burial, and other releases" of various waste by-products has "resulted in contamination of soil, groundwater, equipment, tanks, sewer lines, the sewage treatment plants, and sediments and flood plains...."[9] One of the byproducts produced at the site was dioxin, an extremely hazardous substance. Hercules had placed the waste residue containing dioxin in drums and buried the drums at the site and nearby landfills. In 1975, however, Vertac began storing its drums above ground apparently with the hope that the waste might someday be recycled. By 1986, there were nearly 29,-000 waste-filled drums at the site.[10] In 1987, Vertac went into receivership and abandoned the site, leaving the drums there.

Litigation involving the Jacksonville site commenced in 1980 and is still pending in the United States District Court for the Eastern District of Arkansas.[11] Suits filed by the Environmental Protection Agency ("EPA")[12] and the Arkansas Department of State in the District Court in 1980 were consolidated and an injunction was issued ordering Vertac to take measures to stop chemical leakage.[13] Relief against Hercules was denied at that time because it had ceased operations at the site in 1971.[14] Cleanup efforts addressing various sources of contamination at the site continued during the mid–1980s under a court-approved consent decree to which Hercules was a party.[15] This arrangement fell apart in 1987, when Vertac abandoned the site as a result of financial insolvency. Hercules was later found liable for the lion's share of cleanup costs as an "owner/operator and arranger" under CERCLA.[16]

After further proceedings a judgment was entered against Hercules imposing joint and several liability of over $100 million dollars, mostly in connection with the incineration of the drums referred to above. While the instant appeal was under submission to this Court, the Eighth Circuit reversed the CERCLA judgment and related rulings and remanded to the district court for a determination of Hercules' liability in light of CERCLA's "divisi-

9. *United States v. Vertac,* E.D. Ark., 966 F.Supp. 1491, 1494–95 (1997).

10. These are sometimes referred to as the "Vertac barrels" or "barrels."

11. For a history of the proceedings, see *United States v. Hercules, Inc.,* 8th Cir., 247 F.3d 706 (2001).

12. The EPA initially sued under the Resource Conservation and Recovery Act and the Clean Water Act. The lawsuit was later converted into action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). *See Hercules,* 247 F.3d at 713.

13. In addition to these government suits, Hercules has been named as a defendant in several private suits related to the Jacksonville operations.

14. *See United States v. Vertac Chemical Corp.,* E.D. Ark., 489 F.Supp. 870 (1980).

15. *See United States v. Vertac Chemical Corp.,* E.D. Ark., 588 F.Supp. 1294 (1984).

16. *See United States v. Vertac,* E.D. Ark., 79 F.Supp.2d 1034, 1035–36 (1999) (noting that the district court entered judgment against Hercules as an "owner/operator and arranger" in an amount over $100 million plus any additional response costs to be incurred). Because Vertac was apparently responsible for most of the waste at the site, it has been acknowledged that Hercules has "been left holding the bag" for Vertac. *Id.* Hercules was found jointly and severally liable together with Uniroyal Chemical, Ltd., which was "was found liable as an arranger based on tolling agreements... whereby Uniroyal sent 1,2,4,5–tetrachlorozobene ("TCB") to Vertac for Vertac to convert into 2,4,5–T for Uniroyal." *Id.* at 1036.

bility of harm" doctrine.[17] Therefore, the amount of Hercules' liability in the EPA action is undetermined. Nonetheless, Hercules continues to seek declaratory relief with respect to its potential liability in the ongoing federal litigation, as well as coverage for other liabilities related to the Jacksonville site.

### The Final Judgment Order

The jury found that property damage occurred at the Jacksonville site in each of the years from 1957–1980. The jury found that Hercules had been held liable for property damage that was the result of one "occurrence," a term defined in the policies.[18] The total amount of Hercules' costs in connection with the Jacksonville site as of the Sept. 30, 1997 cutoff date totaled $28,522,910.60, of which approximately $12 million was related to defense costs (legal expenses and investigation) and $16 million to indemnification for environmental cleanup. Under a ruling of the trial court, Home's policy did not cover any of the defense costs.

The portion of the $28,522,910.60 in total costs that was attributable to the 1964–1970 policies was calculated as $7,131,583.[19] This amount was further reduced to reflect Hercules's self-retention, which was similarly allocated to the 1964–1970 period. Under the "modified pro rata allocation" formula adopted by the trial court to reflect LMI's "portion of the risk" from 1964–70, LMI was ultimately found liable for $6,395,839. Following the same methodology, the total indemnification costs recoverable under Home's policy was $128,964. As noted above, American Home was not subject to any money judgment because its coverage had not attached as of Sept. 1, 1997. Finally, the trial court awarded prejudgment interest against LMI and Home totaling approximately $2,500,000.

### Issues in this Appeal

On appeal, Hercules raises seven issues. It argues that the trial court committed the following reversible errors: (1) allocating loss among triggered policies in accordance with a "modified pro rata allocation" formula as opposed to finding the insurers jointly and severally liable for all sums; (2) finding that the policies have single, per-occurrence limits as opposed to annual limits; (3) construing the pollution exclusion in the 1963–1964 policies the same way that it construed the 1970–1980 pollution exclusion in its instructions to the jury; (4) enforcing the pollution exclusion contained in the 1973–1980 policies notwithstanding an underlying insurer's failure to file that exclusion in compliance with state law; (5) ruling on summary judgment that the cleanup costs to incinerate the Vertac barrels are not covered as a matter of law; (6) holding that the Home Insurance policy does not pay for Hercules defense costs; and (7) setting the accrual date for prejudgment interest as the date the complaint was filed instead of when the policy levels were reached.

---

**17.** See Hercules, 247 F.3d at 719.

**18.** Final Judgment Order, at 3. It is important to note the related jury finding that, with certain exceptions not relevant to this appeal, this property damage was not caused by a "sudden, unexpected and unintended" happening within the meaning of the pollution exclusions, explaining why only the 1964–1970 policies (which do not contain such exclusions) respond to Hercules' costs.

**19.** This amount was calculated by dividing the total costs by the number of days of property damage in the years 1957–1980 to arrive at a daily cost average and then multiplying that figure by the "period of coverage [i.e., December 15, 1964—July 31, 1970] in days." Final Judgment Order, at 10.

We agree with Hercules that the trial court erred in allocating loss according to a proration formula. Accordingly, we reverse the judgment of the trial court and remand for proceedings consistent with this Opinion. We affirm the judgment of the trial court with respect to the remaining issues raised by Hercules. In addition to the seven issues raised by Hercules, we address certain cross-appeals of appellees.

### Insurers Are Liable for All Sums They Are Obligated to Pay Under the Policies

■ The policies sold to Hercules from 1960 to 1964 and from 1970 to 1980 contain pollution exclusions that bar coverage for property damage caused by pollution unless the pollution is caused by a "sudden, unexpected and unintended event." The jury found that the pollution damage at the Jacksonville site was continuous from 1957 through 1980 and that such damage constituted a single "occurrence" under the insurance policies at issue. Because the jury also found that none of this pollution damage resulted from any "sudden, unexpected and unintended" event, however, insurance coverage for such damage is excluded under the policies containing the exclusion, leaving only the policies issued during the period 1964–70.

Before trial, Hercules sought a ruling that the insurers whose policies were triggered by an occurrence and which policies did not contain operative exclusions would be jointly and severally liable for damage arising out of the occurrence. The insurers argued that liability should be apportioned on a pro rata basis. In its Sum-

mary Judgment Opinion, the Superior Court agreed with the insurers that the liability should be allocated pro rata among the insurers according to time on the risk.[20] The Superior Court rejected Hercules' argument, based principally on "all sums" language in the policies, that insurers whose policies were triggered should be held joint and severally liable. The Superior Court's decision was based on *E.I. du Pont de Nemours and Co. v. Admiral Ins. Co. ("DuPont").*[21]

Hercules' points to the "all sums" language in support of joint and several liability. According to Hercules, given this language and the absence of any proration clause, there is no basis to apply pro rata allocation. Hercules relies on *Monsanto Co. v. C.E. Heath Compensation and Liability Ins. Co. ("Monsanto").*[22] In *Monsanto*, we held under Missouri law that policy provisions similar to those in this case preclude pro rata allocation.

The insurers argue that because *Monsanto* did not interpret Delaware law, and because it did not address the implications of the "continuous trigger" theory allegedly applicable to this case of long-term gradual pollution, the trial court properly chose pro rata allocation under *DuPont.* We hold that pro rata allocation is inconsistent with the "all sums" provisions in the policies.

■ Our analysis of this issue begins with the language of the insurance policies. Proper construction of the policy language is a question of law that we review de novo.[23] Our goal is to ascertain the intent

---

**20.** Summary Judgment Opinion, at 32–36. *See id.* at 36 ("Defendants are liable in proportion to the time period their policies covered the risk.").

**21.** Del.Super., Civ. A. No. 89C–AU–99, 1995 WL 654020, Steele., V.C., (Oct. 27, 1995) (Mem.Op.).

**22.** Del.Supr., 652 A.2d 30 (1994).

**23.** *See Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1195–96 (1992).

of the contracting parties based on the contract terms.[24] Ambiguity exists when the contractual provisions in controversy are "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[25]

The policies contain or follow form to generally similar provisions, which provide:

> Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability... for damage, direct or consequential and expenses, all as more fully defined by the term "ultimate net loss" on account of ... Property Damage ... caused by or arising out of each occurrence happening anywhere in the world.

In addition, the policies define "occurrence" as:

> An accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating

from one premises location shall be deemed one occurrence.

In *Monsanto*, this Court held that a nearly identical "all sums" provision did not support pro rata allocation. The reasoning in *Monsanto* applies to this case, and we therefore quote from the portion of the *Monsanto* decision explaining the operation of the "all sums" language:

> The ESLIC policy provides that it will indemnify "the Assured," Monsanto, for all sums which Monsanto becomes obligated to pay for particular types of harm, such as bodily injury or property damage that is caused by an "occurrence." An "occurrence," in turn, is defined as an "accident," "happening" or "event" that results in unexpected and unintended injury or damage during the policy period.
>
> A policy is activated by bodily injury or property damage that takes place "during the policy period." The triggering language in the Monsanto insurance policies does not define the extent of the coverage. Once a policy is on the risk, the unambiguous policy language requires the insurance company to pay "all sums" for which the policy holder shall become liable, up to the policy limits. That language defines ESLIC's duty under its policies as the obligation to pay "all sums" for which Monsanto becomes

---

**24.** *See id.* ("When the language of an insurance contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented."); *see also E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, Del. Supr., 686 A.2d 152, 155–56 (1996) ("*Allstate I*"). *Allstate I* is discussed below in connection with the issue related to the Vertac Barrels. Another of the opinions belonging to the *DuPont* litigation, which we will refer to as *Allstate II* for the purposes of clarity in this opinion, is discussed below in connection with the issue relating to the interpretation of

the pollution exclusions. The *Allstate II* opinion is reported as *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, Del.Supr., 693 A.2d 1059 (1997). Further, we note that *Allstate II* affirmed two separately reported decisions of the trial court: *E.I. du Pont de Nemours and Co. v. Admiral Ins. Co.*, Del.Super., 711 A.2d 45, 64–65 (1995) and *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, Del.Super., C.A. No. 89C–AU–99, 1996 WL 769627, Steele, J. (Dec. 24, 1996) (Mem.Op.). Each of these are also cited below.

**25.** *Rhone–Poulenc*, 616 A.2d at 1196.

liable—not a proportionate share.[26]

Thus in *Monsanto* we held that the "all sums" language is inconsistent with pro rata allocation based on time on the risk. To the extent this holding was based on unambiguous policy language, it is not limited by the fact that *Monsanto* decided an issue of Missouri law. Furthermore, *Monsanto* noted that a majority of courts do not prorate liability where the policy does not contain a proration provision.[27] We believe that the *Monsanto* doctrine should be applied here. Therefore, we will "fol- low the majority rule and not read a pro rata allocation of coverage" into the insurer's policies in this case.[28] Accordingly, the insurers are jointly and severally liable for sums they are legally obligated to pay.[29]

▮ Although our holding is based on the "all sums" provision as interpreted by this Court in *Monsanto*, we also conclude that the *equitable* considerations [30] underlying the decision of the Superior Court in *DuPont* do not have force in this case.[31]

**26.** *Monsanto*, 652 A.2d at 34–35. *See also* Ostrager & Newman, Insurance Coverage Disputes 453 (9th ed.1997) (noting "a growing trend for courts to consider the issue of allocation of liability among triggered policies as distinct from what constitutes the trigger of coverage").

**27.** *See Monsanto*, 652 A.2d at 35 n. 6 (collecting authorities). *See also Allstate Ins. Co. v. Dana Corp.*, Ct.App. Ind., 737 N.E.2d 1177, 1189–91 (2000) (construing all sums language, which was found ambiguous, against the insurer; citing the reasoning of this Court in *Monsanto* for its rejection of allocation according to time on the risk); *American National Fire Ins. v. B & L Trucking and Construction Co.*, 134 Wash.2d 413, 951 P.2d 250, 255–57 (1998) (*en banc*) (citing and following *Monsanto;* noting as well that "[u]sually, when a continuous trigger is utilized, costs are not apportioned between triggered policies, but insurer's rather, are held jointly and severally liable").

**28.** *Id.* at 35. The policies could have contained proration provisions but did not. *See id.* at n. 7 ("But where there is no provision in a policy of insurance providing for prorating if other insurance exists upon the same subject matter, a company against whom suit is brought after loss cannot insist upon prorating the loss with other companies thereon, even though the insured may be limited to the recovery of a single indemnity.") (quoting 6 John A. & Jean Appleman, Insurance Law & Practice § 3905, at 436–37 (rev. ed.1972; Supp.1993)).

**29.** *See* Ostrager & Newman, § 9.04[a] (noting that "courts have predicated joint and several liability on the 'all sums' language contained in the standard CGL policy"). Our clarification of the *Monsanto* decision recognized that liability for "all sums" does not automatically equate to joint and several liability; for example, harms may be divisible. *Monsanto*, 652 A.2d at 36. In this case, the jury found that the property damage was the result of a single occurrence.

**30.** Following *DuPont*, the trial court concluded that the imposition of the continuous trigger presumption made pro rata allocation "appropriate" and joint and several liability "illogical." Summary Judgment Opinion at 35. The trial court did not mention *Monsanto*. Similarly, on appeal, the insurers rely primarily on what they describe as "considerations of logic and fairness."

The insurers also argue for pro rata allocation based on the policy language, but argue merely that pro rata allocation is "consistent" with the "all sums" policy language. This argument fails under *Monsanto*.

It also fails because this amounts to a tacit argument that the policy language is ambiguous. Under the doctrine of *contra preferentum* the ambiguity would be construed against the insurers. *See Kaiser Alum. Corp. v. Matheson*, Del.Supr., 681 A.2d 392, 398 (1996); *Delmarva Health Plan, Inc. v. Aceto*, Del.Ch., 750 A.2d 1213, 1214 (1999) (quoting *Hallowell v. State Farm Mut. Auto. Ins.*, Del. Supr., 443 A.2d 925, 926 (1982)).

**31.** *Cf. In re Prudential Lines, Inc., v. American Steamship Owner's Mutual*, 2d Cir., 158 F.3d 65, 86 (1998) (noting that pro rata allocation generally rests on "considerations of equity and policy, rather than contract wording," but noting the "the lack of any compelling

The *DuPont* Court imposed "pro rata allocation based on time on the risk" notwithstanding "all sums" provisions in the policies at issue.[32] The rationale for this method of allocation rested on the trial court's use of the "continuous trigger" method of determining which policies are triggered.[33] Having chosen the continuous trigger, the *DuPont* Court next explained why in its view the continuous trigger theory "requires" pro rata allocation:

> The use of the continuous trigger requires the presumption damage occurred at a constant, continuous rate from the inception of the environmental damage. The method of allocation must coincide with that presumption. For this reason, the Court concludes joint and several allocation is inconsistent with the imposition of the continuous trigger.

* * *

policy or equitable reasons favoring allocation" in the case before it)

**32.** *DuPont* at *15.

**33.** *Id.* The "continuous trigger" involves a presumption that, in cases of long-term, gradual damage such as pollution, the damage occurred at a constant rate, relieving the parties from having to quantify the rate and extent of pollution. *See New Castle County v. Continental Cas. Co.*, 725 F.Supp. 800, 811–12 (1989). In *New Castle County*, the presumption was justified on the basis that the term "injury" is ambiguous and should be construed against the insurers to preserve coverage. *Id.* at 812–13. In *DuPont*, by contrast, the trial court found the "policy language pertaining to 'occurrence and property damage' clear and unambiguous with no temporal limitations." *DuPont* at *10. Therefore it found that a policy could be triggered at any stage of the continuous property damage. *Id.* Accordingly, an entire injurious process may constitute injury, thereby triggering every policy in effect during that process. The presumption preserves coverage because it relieves the insured of the "impossibility" of proving when damage occurs. *See New Cas-*

[I]t is illogical to compress all of this damage into one policy period and hold each insurer fully liable. The presumption of continuous damage logically and fairly requires the imposition of the modified pro rata allocation of damage.[34]

The *DuPont* case concerned potential liability[35] for damages occurring over a period of at least five decades and implicating nearly twenty years of coverage. The insured in *DuPont* was seeking coverage for damages arising from manufacturing activities at three locations that had been "ongoing for decades... resulting in the contamination of the surrounding land, surface waters and ground waters."[36] The disposal of hazardous waste at one of the sites occurred "from 1930 until 1977."[37] It is apparent that in the view of the *DuPont* court this factual scenario lent itself to the continuous trigger presumption.[38] In *DuPont* the *insured* requested

*tle County*, 725 F.Supp. at 812 ("[I]t would be impossible in this case to determine when the first molecule of contaminant damaged neighboring property, or at what rate the contamination spread.").

**34.** *DuPont* at *15.

**35.** *DuPont* decided the allocation issue on cross-motions for summary judgment. *Id.* at 1.

**36.** *DuPont* at *1.

**37.** *Id.*

**38.** *See id.* at *9 ("Since the contamination of the soil... constitutes property damage, *and the process of contamination indisputably had been ongoing for decades*, the continuous trigger should apply.") (emphasis added); *id.* (citing as authority for use of continuous trigger a case in which the damage had been ongoing for over twenty years) (citing *National Union National Union Fire Ins. Co. v. Rhone–Poulenc Basic Chem. Co. of Pittsburgh*, Del.Super., C.A. No. 87C–SE–11, Poppiti, J., 1992 WL 22690 (Jan. 16, 1992), *aff'd sub. nom., Rhone–Poulenc Basic Chem. Co. v. American Motor-*

the continuous trigger, presumably in order to avoid having to prove perceptible harm for each year for which it sought coverage.[39]

In this case, however, Hercules was required to *prove* by a preponderance of the evidence that it had been held liable for property damage during each policy year from 1961 to 1980.[40] The insurers concede that no evidence to the contrary was offered.[41] Given the relatively limited time frame ultimately involved in this case,[42] and the fact Hercules proved by a preponderance of the evidence the occurrence of property damage in each relevant policy year, Hercules has derived little if any benefit from a continuous trigger theory. Therefore, it would not be equitable to diminish its coverage as a result of a presumption of continuous damage.

Additionally, one of the key equitable considerations in *DuPont* was that the insured "consciously chose to self-insure until [it] began to purchase excess insurance," and had not "demonstrated the unavailability of insurance during the period [it] self-insured."[43] Proration according to time on the risk would include those years in which the insured was self-insured, thus preventing the "windfall" to the insured that would supposedly result from joint and several liability.[44] The insurers argue that joint and several liability would result in a windfall in this case because it would allow Hercules to recover for the years in which it had not purchased applicable pollution insurance, *i.e.*, continuing, post–1970 damages would be "telescoped" into policies issued during 1964–70.

In this case, however, the policies contain or follow form to non-cumulation clauses that provide:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Item 2 of the Declaration shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

> Subject to the foregoing paragraph and to all other terms and conditions of this policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the Assured for liability in respect of such personal injury or property damage without payment of additional premiums.

Together with the "all sums" provisions set forth above, the second paragraph of this

---

*ists Ins. Co.*, Del.Supr., 616 A.2d 1192 (1992)).

**39.** See *DuPont* at \*7 (noting insured's reliance on *New Castle County v. Continental Cas. Co.*, 725 F.Supp. 800 (1989)).

**40.** Final Judgment Order, at 2. As Hercules points out, there is no requirement in the policy that it prove the precise amount of property damage occurring in any given policy year, since the policy is triggered by any occurrence that happens during the policy period.

**41.** The insurers argue that Hercules itself did not offer evidence to establish when damage occurred. Nonetheless, the jury found that damage did occur.

**42.** The jury's verdict following the trial establishes that only three policies providing coverage for all or part of the 1964–70 period are at issue due to the pollution exclusions. Rulings before trial limited the relevant time period to the years 1957–1980.

**43.** *Id.* at \*16 ("[R]ather, it consciously decided to carry its own risk.") It appears that the insured was self-insured for a period of decades, declining to buy insurance until the 1960's. *Id.* at \*1.

**44.** *Id.* at \*14, \*16.

clause extends coverage beyond the policy period in the case of continuing damage.[45] Recognizing that this clause cannot be reconciled with pro rata allocation, the Superior Court held that "pro rata allocation... implicitly prevents [the second] paragraph [from] applying for Hercules' benefit."[46]

Rather than giving way to pro rata allocation, this contract provision undercuts the rationale for pro rata allocation because it provides continuing insurance for post–1970 damage arising out of a continuing occurrence (subject, of course, to the policy limits). Joint and several liability does not result in a "windfall" to Hercules because of the continuing coverage Hercules purchased. Under the contract, Hercules is entitled to coverage for damages occurring after the insurer's time on the risk once a policy has been triggered. The *DuPont* decision did not take into account any type of non-cumulation clause similar to the one present in this case. Although our holding rests solely on our decision in *Monsanto* based on the unambiguous "all sums" provision, this strengthens the conclusion that the equitable considerations on which the decision in *DuPont* rested are inapplicable to this case in any event.

### Application of Non–Cumulation Clause to Home

■ The Home Insurance Company cross-appeals the trial court's determination with respect to the first paragraph of the non-cumulation clause. That provision, which is excerpted above, reduces recovery under an excess policy to the extent that the insured already recovered under "a policy issued prior to the inception date" of that excess policy. The trial court ruled that because the pre–1964 policies do not provide coverage (due to the pollution exclusions), there was no recovery under policies issued before the inception date of the excess policies, and therefore the first paragraph of the provision is inapplicable.

Home argues that this determination is correct as to policies with 1964 inception dates, but not as to its own policy, which has an inception date of July 31, 1968. Because the trial court's Final Judgment Order found coverage between the years 1964–1970 under LMI's policy, the amounts owed by Home should be reduced to reflect the coverage provided by LMI before the Home inception date in 1968. In response, Hercules argues that the LMI policy providing coverage is not "prior" insurance, because by following form to the LMI policy the Home policy incorporates LMI's 1964 inception date.

Hercules' argument must fail. The fact that Home follows form to the LMI non-cumulation clause does not mean that Home is deemed to have the same 1964 inception date when in fact its policy did not begin until 1968. The trial court held that the non-cumulation clause "limits the insurer's liability, based on amounts paid under earlier contracts,"[47] a conclusion not appealed by any of the parties. The only issue concerns the trial court's conclusion that the clause did not apply because there

---

45. *See Liberty Mutual Ins. Co. v. Those Certain Underwriters at Lloyds,* W.D.Pa., 650 F.Supp. 1553, 1559 (1987) ("There can be no clearer indication that these policies were intended to provide coverage for all damage regardless of when they occurred, provided that they derived from the 'occurrence' which triggers coverage."); *FMC Corp. v. Plaisted and Cos.,* 61 Cal.App.4th 1132, 72 Cal.Rptr.2d 467, 499 (1998).

46. Post–Trial Opinion, at 11.

47. Post–Trial Opinion, at 7. *See, e.g., Endicott Johnson Corp. v. Liberty Mutual Ins. Co.,* N.D.N.Y., 928 F.Supp. 176, 181–82 (1996) (stating that the purpose of the non-cumulation clause is to prevent recovery exceeding the per occurrence limit).

was no "prior insurance." We disagree with this conclusion as to Home. Since the inception date of the Home policy is July 31, 1968, policies providing coverage before that date implicate the non-cumulation clause in Home's favor.

### The Policies Contain One Limit Per Occurrence Not Annualized Limits

■ Hercules argues that the trial court erred in holding that liability limits contained in the multi-year policies for the years 1964–1970 are limits per occurrence.[48] Hercules argues that these limits are annual limits. Thus, instead of a collective limit of $25 million for the one occurrence found by the jury, Hercules argues that the policies must pay up to $25 million for each of the roughly six years during the 1964–1970 policy period, resulting in total coverage up to $125 million. The trial court held that, based on the language of the policies, a single per occurrence limit applies. We agree.

Our holding is based on unambiguous language in the policies. The policies provide for two different types of limits depending on the type of damage for which recovery is sought. With respect to "Products Liability," and "Personal Injuries," there is a limit "in the aggregate for each annual period." With respect to "Automobile Liability," "Aircraft Liability," and "all [other] occurrences" there is a limit "in all in respect of each occurrence." Similarly, in describing the insured's self-retention of $2 million, the policy differentiates between a self-retention in respect of "each occurrence" and a self-retention "in the aggregate in any policy year," again according to the type of occurrence involved.[49] Finally, the term "occurrence," to which the limits relate, refers to damage during the "policy period," with the "period" defined as "15th December, 1964 to 31st July 1970."[50] This language setting forth the occurrence limits unambiguously provides for annual limits in some cases and per occurrence limits in others.[51]

48. This issue applies to the three insurers liable under the Final Judgment Order: LMI, Home, and American Home. LMI has settled, however, and thus Hercules' appeal of this issue is opposed only by Home. American Home agrees with Hercules that the liability limits and self-retention are annual not per occurrence, and has filed a cross-appeal with respect to this issue. In a separate cross-appeal, Allstate Insurance Co. also argues that the self-retention should be annualized. As noted below, our discussion of Hercules' arguments also addresses the cross-appeals of American Home and Allstate with respect to this issue.

Hercules argues that this Court should also find annual limits in policies issued by AmRe and Highlands, which follow form to the North River Policies. These insurers had argued this issue to the trial court before trial, but they were ultimately dismissed from the case because their policies were found not to provide coverage by virtue of the pollution exclusions. Therefore, the trial court did not make a ruling on this issue as to the AmRe

and Highlands policies, and we do not address those policies in this Opinion.

49. This discussion therefore applies to the argument made by Allstate and American Home in separate filings that Hercules' $2 million self-retention should be annualized. The trial court apportioned the self-retention under a pro rata allocation formula. In light of our holding on the allocation issue and the policy language discussed in this section, the self-retention operates on a per occurrence not an annualized basis.

50. In the LMI policy, that is. The Home policy covers the years 1968–1970.

51. See, e.g., CSX Transportation, Inc. v. Commercial Union Ins. Co., D.C.Cir., 82 F.3d 478, 483 (1996) ("We are satisfied that the language setting for the coverage limitations is plain.... The coverage limitation is devoid of any language suggesting that 'each occurrence' should be read as 'each occurrence each year.' "); Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co., App.Div.,

In an attempt to demonstrate that the limits are annual limits, Hercules points to the fact that the premiums were paid in annual installments. Based on this and other "mechanics" of the policies,[52] Hercules argues that its "multi-year policies were essentially no different than a series of single-year policies," characterizing the policies as "annual joint ventures." The fact that payments and certain other activities occurred annually does not establish that the liability limits are annual.[53] To so hold would be to rewrite the unambiguous contract language, expanding coverage above the intended limits. Similarly, the fact that the policy defines the term "policy year" and refers in some provisions to annual periods does not convert all limits into annual limits. As noted above, limits for certain types of occurrences were specified as annual limits.[54] This explains why the policy refers to "policy years." The policy language cited by Hercules pertaining to annual periods does not apply to all "occurrences."[55]

### The 1963–1964 Pollution Exclusions Bar Coverage

■ Policies sold to Hercules covering the period 1960–1964 and 1970–1980 contain pollution exclusions. The pollution exclusion in the 1970–1980 policies is known as NMA 1685. As more fully explained below, this exclusion bars coverage for pollution unless caused by a "sudden, unexpected and unintended" happening. Because the jury did not find that the property damage for which Hercules was found liable was the result of a "sudden" or "abrupt" event, coverage was barred for those years.[56] The pollution exclusion in the 1963–1964 policies is known as NMA

258 N.J.Super. 167, 609 A.2d 440, 468–69 (1992) (interpreting similar language and rejecting annualized limits "where none of the excess policies contained a provision for annualization or included an aggregate limit on liability").

**52.** Hercules argues that "(1) the policyholder had to submit new underwriting information each year; (2) the insurer could, after reviewing the information, decide to cancel the coverage at the annual renewal date; (3) the premium could change each year; and (4) the insurers' individual percentage of participation... could and did change."

**53.** See CSX Transportation, 82 F.3d at 483. Similarly unavailing is Hercules' reliance on an affidavit from a former Hercules executive and trial testimony from LMI underwriters allegedly supporting Hercules' position. This evidence appears to have been admitted under a previous ruling of the trial court that the limits provisions of the AmRE and Highland's policies—not at issue here, as explained above—were ambiguous. In its Post–Trial Opinion, however, the trial court issued a definitive ruling that the language of the Home and LMI policies are unambiguous. We find the language unambiguous as a matter of law. See Pellaton v. The Bank of New

York, Del.Supr., 592 A.2d 473, 478 (1991) ("The proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal.") (citing Klair v. Reese, Del.Supr., 531 A.2d 219, 222 (1987) (citations omitted)). Therefore we will not consider the extrinsic evidence Hercules relies on. See id. (noting that extrinsic evidence should not be considered unless a contract is uncertain in its meaning or application).

**54.** To the extent Hercules argues that there is a relationship between policy "mechanics" and limits, this might also explain why the mechanics described by Hercules operate on an annual basis. Some limits, but not all, are annual.

**55.** In its Reply Brief, Hercules argues that Home should be judicially estopped from arguing against annual limits, because at trial it sought (and received) the jury verdict form requiring the jury to determine whether property damage occurred within each policy year covered by Home's multi-year policy. As we have discussed above, however, this relates to whether a policy is triggered, not to coverage limits.

**56.** See Final Judgment Order, at 3–4.

1333 and is not identical to NMA 1685.[57] The trial court ruled on summary judgment, however, that NMA 1333 is functionally equivalent to NMA 1685,[58] thus barring Hercules from attempting to prove coverage for those years on a separate basis. Hercules argues that the trial court erred in not instructing the jury that the NMA 1333 exclusion could provide coverage in instances where the NMA 1685 exclusion does not. Thus, Hercules argues that it was erroneously deprived of potential coverage for the years 1963–64.

The analysis begins with NMA 1685, which this Court interpreted in *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co. ("Allstate II")*.[59] NMA 1685 excludes coverage for property damage caused by "seepage, pollution or contamination" *except:* "Where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of Insurance."

We held that the term "happening" refers to a causative event; in the terms of the exclusion, a sudden, unintended, and unexpected event *causing* seepage, pollution or contamination.[60] "In essence, the term 'happening' is the cause and the 'seepage, pollution, or contamination' is the effect."[61] This defeats the argument, made by the insureds in *Allstate II*, "that the migration of contaminants, and not DuPont's routine discharges into the environment, caused the contamination...."[62] Under NMA 1685 the insured cannot argue that seepage itself is a covered event, without showing that the migration of contaminants (*i.e.*, seepage) was caused by a "sudden, unexpected and unintended happening." The holding in *Allstate II* was based on the unambiguous language of NMA 1685.[63]

NMA 1333, like NMA 1685, excludes coverage for property damage caused by "seepage, pollution or contamination... [u]nless such seepage, pollution, or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance." But NMA 1333 goes on to provide:

> but this paragraph (3) shall not be construed as excluding any liability which would otherwise be covered under this Insurance for property damage caused by a sudden, unintended and unexpected happening during the period of this Insurance arising out of seepage, pollution or contamination.

The first paragraph quoted above is identical to the exception to the exclusion

57. "NMA" refers to the Lloyd's Non–Marine Association, which drafted these exclusions.

58. Based on this ruling and certain submissions to the trial court made by Hercules we reject the insurers' assertion that Hercules has waived its right to appeal this issue by not raising it below.

59. Del.Supr., 693 A.2d 1059 (1997).

60. *Allstate II*, 693 A.2d at 1061–62.

61. *Id.* at 1062 (quoting the trial court's analysis).

62. As the trial court explained, "The term 'happening' in the exception to NMA 1685 refers to the initial discharge of contaminants into the environment." *E.I. du Pont de Nemours and Co. v. Admiral Ins. Co.*, Del.Super., 711 A.2d 45, 64–65 (1995) (containing the opinion of the trial court that we affirmed in *Allstate II*). Viewing the migration of contaminants as the "cause" of the seepage, pollution or contamination would render the exclusion meaningless. *See id.* at 65 ("The running streams' currents carried the chemicals away from the point of the initial discharge to contaminate other property; however, it not reasonable to focus on the stream's current as the cause of the pollution in order to interpret the exception to the pollution exclusion.").

63. *Allstate II*, 693 A.2d at 1061.

found in NMA 1685. The issue in this case is the effect of the second clause, which the trial court referred to as "the exception to the exception."

We are not required to decide whether these differently worded exclusions provide identical coverage in all cases.[64] Hercules' assignment of error in this case is based on an untenable reading of NMA 1333 which could not lead to coverage on any theory it proposes. Therefore, we find no error in the trial court's treatment of the two exclusions as functional equivalents when it instructed the jury in this case.

NMA 1333 begins by excluding coverage for damage caused by seepage, pollution, or contamination. Next, the first paragraph of NMA 1333 makes an exception to the exclusion where the seepage, pollution, or contamination is caused by a sudden, unintended, and unexpected happening. Therefore, just like NMA 1685, NMA 1333 unambiguously requires that the damage for which coverage is sought have been caused by a "sudden, unintended, and unexpected" happening. The plain language [65] of the "exception to the exception" then provides coverage for damage caused by a sudden, unintended, and unexpected happening *if the happening itself is caused by seepage, pollution, or contamination.*

Hercules, however, advances an interpretation of the "exception to the exception" that does not comport with its plain language:

> That language surely should be read to mean that a happening, such as damage

to groundwater that was caused by seepage, pollution or contamination at the site, is covered to the extent that the pollution *damage* to the groundwater is sudden, unintended, and unexpected. Such a scenario is completely different from the operation of the form NMA 1685, as construed by this Court in *Du-Pont,* when this Court required the *cause* of the pollution to be sudden, unintended and unexpected. Indeed, form NMA 1333 specifically provides for coverage of property damage when the cause is seepage, pollution or contamination.[66]

This reading is untenable because, as stated explicitly in the last sentence of the above excerpt, it allows coverage for seepage, pollution, or contamination. It does so on the theory that the migration of a molecule of contaminant into groundwater is a happening that causes damage. Hercules argues: "[T]he jury also reasonably could have found that when the pollution first came in contact with third-party property, such as groundwater, such a 'happening' was abrupt." As explained above, however, the "contact" is not a happening. The migration of contaminants *is* seepage, and cannot be parsed out to be either a cause or an effect of seepage. Allowing coverage for the migration of contaminants on the theory proposed by Hercules would vitiate the entire exclusion and is inconsistent with the plain meaning of its provisions as interpreted by this Court. Therefore, the jury was properly instructed on the meaning of NMA 1685 and NMA 1333.

---

**64.** *See Phillips Home Builders, Inc. v. The Travelers Ins. Co.,* Del.Supr., 700 A.2d 127, 129 (1996) (noting that proper interpretation requires giving "full effect to all of the contract language").

**65.** We do not agree with Hercules that NMA 1333 is "so profoundly ambiguous as to be incomprehensible." We decline to consider

the extrinsic evidence offered by Hercules consisting largely of drafting history and minutes of the Special Committee of the Lloyd's Underwriter's Non–Marine Association pertaining to NMA 1333.

**66.** Appellant's Opening Brief at 45.

*Failure to File Certain Exclusions with Delaware Insurance Commissioner*

Before trial, Hercules filed a motion styled as a motion in limine seeking to preserve the ability to "present factual evidence to the jury to prove that the North River JU policy provisions, including form NMA 1685 had not been filed [with the Delaware Insurance Commissioner]." [67] The trial court rejected this motion on several grounds. First, Hercules' motion in limine was in reality a motion for summary judgment and hence untimely under the scheduling order. [68] Second, filing of NMA 1685 is not required. Third, even if filing were required, the exclusion would be enforced under the savings provision in the statute [69] because it was not against public policy. Fourth, the insurance commissioner had not sought to contest the provision's validity and "it would be inappropriate to attempt to vindicate the law through a one-sided application of the statute."

■■■ The Superior Court's denial of Hercules' "motion in limine" regarding the NMA 1685 pollution exclusion on the ground that it was untimely under the operative case management order is reviewed for an abuse of discretion. [70] Under Super. Ct. Civ. R. 16(e), pretrial orders "shall control the subsequent course of the action." [71] Pretrial orders "shall not be modified except by leave of the Court upon a showing of good cause." [72] We review *de novo* the trial court's initial determination that the motion in limine was actually a motion for summary judgment. [73]

■■■ We hold that the trial court's characterizations of Hercules' motion as a summary judgment motion was correct as a matter of law. Hercules styled the motion as a "Memorandum of Law in Support of Hercules' Motion in Limine on North River's Failure to Comply with the Delaware Insurance Code." The motion states that North River "has admitted, for the first time, that North River's JU policy forms, including the NMA 1685 pollution exclusion language" had not been filed with the Delaware Insurance Commissioner. Hercules' motion therefore sought a ruling that "nothing in the Court's [Summary Judgment Opinion] precludes the *presentation of evidence* of North River's violation of the Delaware Insurance Code, thereby providing the basis for excluding these exclusions from consideration by the jury." Hercules added, "this Court should hold that Hercules is entitled to *prove at*

---

67. The filing requirement is codified at 18 *Del. C.* § 2712(a). Although North River Insurance Co. has settled with Hercules, certain policies issued for the years 1973–1980 follow form to the North River policy.

68. A "Case Management" order dated November 4, 1996 required motions for summary judgment and partial summary adjudication to be filed by April 30, 1997. Hercules' "motion in limine" was filed on January 20, 1998. Trial started on January 21.

69. *See* 18 *Del.C.* § 2718.

70. *See McLain v. General Motors Corp.*, Del. Supr., 569 A.2d 579, 582 (1990).

71. Super. Ct. R. 16(e); *Cebenka v. The Upjohn Co.*, Del.Supr., 559 A.2d 1219, 1222–23 (1989).

72. *See* Super. Ct. R. 16(b)(5); *cf. McLain*, 569 A.2d at 581–82 (holding that the trial court did not abuse its discretion under the Rule 16 "manifest injustice" standard when it granted a party's motion to present new evidence on the first day of trial, because the plaintiff had recently changed his theory of the case in a "significant way").

73. *Cf. Williams v. Geier*, Del.Supr., 671 A.2d 1368 1375–76 (1996) (holding that this Court's review of a summary judgment determination is *de novo*).

*trial* that North River... fail[ed] to file... and therefore the exclusions are unenforceable...." (emphasis added).

It will quickly be seen that this is not a motion in limine. A motion in limine typically concerns the admissibility of evidence and is a preliminary motion directed at establishing the "ground rules applicable at trial." [74] In contrast, a "summary judgment motion is a determination by the court concerning a case or aspect of a case made prior to trial *that obviates the need for trial of the matter*." [75] In that sense it is not preliminary; it is dispositive of a substantive legal issue. With this in mind, the trial court was correct that Hercules' motion was in reality a motion for summary judgment or partial summary adjudication. There was no dispute about whether the exclusion was filed. The parties agreed that it was not. Therefore the question was an entirely legal one concerning the effect, if any, of the failure to file NMA 1685. Contrary to the language in the motion, there was no issue for the jury to decide and therefore no evidentiary issue.

Hercules next argues that it should be relieved of any violation of the Case Management order because North River's admission of its failure to file, which was made in a submission to the trial court on December 24, 1997, was "newly-discovered information." [76] Hercules argues that before this admission it "could not show" that North River had failed to file. [77] The insurers argue that "Hercules has been intimately involved with litigating the validity of the NMA 1685 pollution exclusion for years" and was on notice of the failure to file.

Based on the record submitted to this Court by Hercules, we hold that the trial court did not abuse its discretion in ruling Hercules' motion untimely under its previous order. [78] Hercules' previous involvement as an *amicus curiae* in litigation over the exclusion is not disputed. Previous case law available within the relevant deadline (and concerning the case in which Hercules was involved) gave some indication that NMA 1685 was not filed in Delaware. [79] We pay particular attention to Hercules' admission that it had "asked the Delaware insurance regulators about

**74.** 3 Moore's Federal Practice § 16.77[4][d] (3d ed.1997); 1033 Black's Law Dictionary (7th ed.1999) (defining Motion in Limine as "a pretrial request that certain inadmissible evidence not be referenced at trial").

**75.** 11 Moore's Federal Practice at § 56.02 (emphasis added).

**76.** *See McLain,* 569 A.2d at 582 (holding that trial court's modification of pre-trial orders was not an abuse of discretion).

**77.** Similarly, an affidavit attached to its briefing on this issue in the trial court avers that before North River's admission Hercules "did not have proof" of the failure to file.

**78.** Our review of this issue is hampered by the fact that the trial court, in its bench ruling, did not discuss Hercules' contention that it was reacting to "newly-discovered information." Obviously, in ruling the motion un-

timely, the trial court implicitly rejected this assertion. Our ruling, however, is based on undisputed facts and the arguments submitted by Hercules.

**79.** *See E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,* Del.Super., C.A. No. 89C–AU–99, 1996 WL 769627, Steele, J. (Dec. 24, 1996) (Mem.Op.), *aff'd sub nom. E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.* Del. Supr., 693 A.2d 1059 (1997) ("Du Pont agrees that no filings were made in Delaware regarding the NMA 1685 exclusion. Pl.'s Mem. Addressing Supr. Ct.'s Remand Order at 8. The State agrees that NMA 1685 was neither filed nor required to be filed in Delaware. Brief of Amicus Curiae State of Del. in Sup. of Appellant at 11 n. 7 ("Amicus Brief").") This statement, however, does not indicate that North River was not required to file the exclusion.

the... exclusion" but were told that the regulators "were unable to ascertain" whether a filing had taken place because it did not keep the relevant records. On these facts, the trial court could reasonably conclude that Hercules was not unfairly surprised by North River's admission and could not show cause for filing its motion on the eve of trial.[80] We cannot say that the trial court abused its discretion in declining to modify its case management order.

■ As an alternative ground, we agree with the trial court's holding that under the circumstances of this case it would be improper and inequitable to void NMA 1685 in the circumstances present here.[81] Since North River has settled, voiding the exclusion could affect only the several excess following form insurers, whom Hercules does not contend were required to make a filing. Assuming this

effect (which the following form insurers dispute on various grounds), Hercules would receive millions of dollars of coverage for which it had not bargained. Most important, extensive litigation over NMA 1685 has resulted in definitive interpretations of the pollution exclusion, which we have determined is "unambiguous" [82] and not contrary to public policy.[83] Accordingly, there is little basis for invalidating NMA 1685.[84] Under these unique circumstances, we decline to invalidate NMA 1685 notwithstanding North River's failure to file.

### *Recovery of Costs Relating to Incineration of Barrels of Waste*

■ When Vertac abandoned the site, it left behind 29,000 barrels containing hazardous materials. The EPA had the

---

80. *Cf. E.I. du Pont de Nemours & Co.,* Del.Super., No. 89C–AU–99, 1995 WL 465148 at * 2, Steele, J. (July 11, 1995) (Mem.Op.) (extending discovery deadline where "no party knew or had reason to believe that" a witness still lived).

81. We express no opinion, however, regarding the trial court's holding that filing was not required to begin with.

82. *Allstate II,* 693 A.2d at 1061–62; *see also E.I. du Pont de Nemours and Co. v. Admiral Ins. Co,* Del.Super., 711 A.2d 45, 62 (1995) ("Therefore, the exceptions to the pollution exclusions are clear and unambiguous.").

83. *Allstate II,* 693 A.2d at 1062.

84. *See Clark Equipment Co. v. Liberty Mutual Ins. Co.,* Del.Super., C.A. No. 89C–10–173–VAB, Bifferato, J. (February 7, 1997) (Let. Op.) Let. Op. at 3 (upholding endorsement that had not been shown to be approved because it was "valid and unambiguous"; applying Michigan law). In a similar context in the *DuPont* litigation, the Superior Court explained why NMA 1685 should be enforced notwithstanding the State's argument that

regulatory estoppel should apply because of allegedly misleading representations insurers had made concerning the application of NMA 1685:

> The State can have no regulatory interest in policy language never required to be submitted for approval by its regulators. To put it differently, the State implicitly has already indicated its lack of interest in the interpretation of NMA 1685 by its decision to exempt NMA 1685 from the regulatory process.
>
> Moreover, the general policy considerations undergirding the regulatory process are not implicated here either. In particular, through its insurance regulatory process the State seeks to protect the public generally from the take-it-or-leave-it policies offered by the industry. But no such interest is present where, as here, the insured bargained for and received the particular language of the policy.

*E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,* Del.Super., C.A. No. 89C–AU–99, 1996 WL 769627 at * 2, Steele, J. (Dec. 24, 1996) (Mem.Op.), *aff'd sub nom. E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.* Del.Supr., 693 A.2d 1059 (1997).

o

barrels repacked, but later determined that incineration was necessary.[85]

Hercules contends that the trial court erred when it granted summary judgment for the insurers on whether Hercules could recover for costs incurred in connection with the EPA-ordered incineration of the more than 29,000 drums of waste. The trial court excluded coverage based on its conclusion that these costs were incurred for preventative measures. Alternatively, the trial court found that "owned property" and pollution exclusions barred coverage. Because we agree that the costs associated with incinerating the barrels were for preventative measures, we affirm. We need not, and do not, address whether the "owned property" and pollution exclusions would also bar coverage.

■■■■■ This Court must determine "whether the record shows that there is no genuine, material issue of fact and the moving party is entitled to judgment as a matter of law."[86] This Court's review is "de novo, not deferential, both as to the facts and the law."[87] "The facts of record, including any reasonable hypotheses or inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party."[88]

As described above, Hercules purchased the Jacksonville Site in 1961. In 1976, the site was purchased by Vertac Chemical Corp. Vertac owned and operated the site until 1987, when it abandoned the site due to bankruptcy.[89]

From 1961 until 1986, manufacturing processes at the plant produced several hazardous wastes, including dioxin. In 1964 Hercules began storing the dioxin in solid form in steel drums that were buried in a landfill on the site.[90] This practice continued until 1975, at which time Vertac began storing the waste in barrels above ground at the site with the hope that it might someday be recycled. Most of the waste that was the subject of the incineration efforts was accumulated between 1979 and 1986, when Hercules had no involvement with the site.[91]

In 1987, after Vertac had abandoned the site,[92] EPA initiated a removal action because "the wastes on the site posed a threat to public health and welfare and the environment."[93] Eventually, the EPA ordered incineration of the barrels, a lengthy and multi-layered process that accounts for most of the $100 million incurred thus far in cleaning up the site.[94] As explained

**85.** See United States v. Vertac, E.D.Ark., 33 F.Supp.2d 769, 772 (1998).

**86.** Williams v. Geier, Del.Supr., 671 A.2d 1368, 1375 (1996) (citing Arnold v. Society For Sav. Bancorp, Del.Supr., 650 A.2d 1270, 1276 (1994)).

**87.** Id.

**88.** Id. (citing Bershad v. Curtiss–Wright Corp., Del.Supr., 535 A.2d 840, 844 (1987)).

**89.** See United States v. Hercules, Inc., 8th Cir., 247 F.3d 706, 711–13 (2001).

**90.** See United States v. Vertac Chemical Corp., E.D.Ark., 489 F.Supp. 870, 875 (1980).

**91.** See United States v. Vertac Chemical Corp., E.D.Ark., 79 F.Supp.2d 1034, 1035–36 (1999).

**92.** The district court noted that Hercules was "left 'holding the bag' for Vertac, who at least arguably caused the greatest amount of harm." Id. at 1036. The court also noted that Hercules had shown concern for the safety and cleanliness of the site, stating, "[T]here is no doubt that Hercules' safety and environmental programs are to be commended." Id. at 1040.

**93.** See United States v. Vertac Chemical Corp., E.D.Ark., 33 F.Supp.2d 769, 772 (1998).

**94.** See id. at 774–775 (describing steps taken to incinerate barrels).

earlier, Hercules was initially found liable to the United States government for almost all of these costs, but the Eighth Circuit recently reversed and remanded the judgment against Hercules.[95] Thus the full extent of Hercules' current and future liability is not yet clear.

These facts are preliminary to the issue whether the trial court erred in granting summary judgment to the insureds on the ground that Hercules' costs were incurred for non-covered preventative measures. Under Delaware law, coverage is excluded for preventative measures even in the absence of a mitigation clause in the insurance policies.[96] "Strong public policy concerns" favor placing a duty on insureds to act before environmental damage accumulates, rather than allowing insureds to recover under their policies after pollution has already occurred.[97] Moreover, the "duty to mitigate gives meaning to the distinction between sums expended for prevention and those expended 'because of property damage.'"[98] Coverage is available for sums spent for "remediating property damage" but not for sums spent to "prevent further damage."[99] The issue in this case is whether the barrel incineration operation was remedial or preventative.

Cases examining this distinction provide useful guidance. In *New Castle County v. Hartford Accident and Indemnity Co,*[100] the underlying claims against the insured were for three remedies: "(1) compensation for injury suffered by the respective plaintiffs; (2) injunctive relief forcing the County to cleanup the contaminants released by the landfill, or compensation for costs expended by plaintiffs to do the same; and/or (3) injunctive relief forcing the County to take the actions necessary to prevent the further release of contaminants from the landfill, or compensation for the costs incurred by the plaintiffs in doing the same."[101] The court held the insurer liable for the first two categories of costs, but denied coverage for the last category, which were "essentially the costs required to remedy those 'faults' in the landfills which lead to the release of contaminants."[102] Turning to the specifics of the underlying complaints, the court held that costs sought for "(1) covering and grading of the landfill; (2) digging a drainage ditch around the landfill; and (3) treatment of the leachate prior to its discharge into [a creek]" were all excluded preventative measures.[103] The court found coverage for costs for "removal of *escaped* contaminants,"[104] but, significantly, excluded coverage for costs "for *cleanup* of the

---

**95.** See *United States v. Hercules, Inc.,* 8th Cir., 247 F.3d 706 ( 2001).

**96.** *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.,* Del.Supr., 686 A.2d 152, 156 (1996) ("*Allstate I* "); *Rhone–Poulenc Basic Chemicals v. American Motorists Ins.,* Del.Supr., 616 A.2d 1192, 1197 (1992).

**97.** See *Rhone–Poulenc,* 616 A.2d at 1197.

**98.** See *Allstate I,* 686 A.2d at 156 (*citing Rhone–Poulenc,* 616 A.2d at 1197).

**99.** *Id.* Hercules argues that this rule does not apply here because it is not a "wrongful insured," having been saddled with a mess cre-

ated primarily by Vertac. Hercules cites *Wise v. Western Union Telegraph Co.,* Del.Super., 181 A. 302 (1935) and *Slay Warehousing Co. v. Reliance Ins. Co.,* 8th Cir., 471 F.2d 1364 (1973). These authorities do not support its argument.

**100.** D.Del., 685 F.Supp. 1321 (1988).

**101.** *Id.* at 1331–32.

**102.** *Id.* at 1332.

**103.** *Id.*

**104.** *Id.* (emphasis added).

landfill to *prevent the future escape* of contaminants." [105]

In this case, the federal court opinions in the underlying litigation could not be clearer that the reason why the barrels were repacked and then incinerated was the *immediate threat of future harm*.[106] As noted by the federal district court, the still bottom wastes had already been stored in barrels, which were "stored in deteriorated sheds, on uncurbed concrete pads, and in open fields," with some of the drums "stacked three high on deteriorating wooden pallets." [107] As in *New Castle County*, the wastes have been already been stored. The incineration actions are essentially the same as actions taken to clean up a landfill or dig a drainage ditch around a landfill to prevent further contamination. Hercules is simply paying for "the costs required to remedy those 'faults'" in the current containment scheme that threaten nearby areas.[108]

The storage of the wastes in barrels is analogous to storage in a landfill. Hercules has a duty to pay for measures taken to ensure safe disposal or safekeeping of waste that has already been stored but threatens to cause *future* damage.

Hercules argues that there is a factual dispute regarding the nature of the incineration costs, precluding summary judgment. We disagree. What is at issue is not a factual dispute, but the legal conclusion to be drawn from the undisputed facts. For example, Hercules argues that a jury could find that the incineration costs were cleanup costs because "the incineration cleaned or neutralized the hazardous material in the double-packed Vertac barrels by destroying all significant traces of dioxin that may have been contained in them." In a slightly different vein, Hercules argues that a jury could find that "the mere presence of those barrels ... constituted property damage to the Vertac real

---

**105.** *Id.* (emphasis added). Similarly, in *Rhone–Poulenc,* coverage was denied for "the cost of measures taken to prevent the further release of contaminants from a landfill." 616 A.2d at 1198. In that case, "[t]he sludge was transported to the landfill in open 55–gallon drums and was poured directly into the ground." *Id.* at 1194. *See also The Boeing Co. v. Aetna Cas and Surety Co.,* 113 Wash.2d 869, 784 P.2d 507, 515–16 (1990) (distinguishing, in hypothetical example, between Tank # 1 that has already leaked and Tank # 2 that "could eventually leak unless corrective measures are taken;" stating that Tank 1 costs are covered but not Tank 2 costs).

**106.** *See United States. v. Vertac Chemical Corp.,* E.D.Ark., 33 F.Supp.2d 769, 772–775, 783–75 (1998). For example, explaining why the EPA intervened to complete the incineration, the court found: "EPA determined that an imminent threat to the community existed given that over 16,000 drums remained containing highly corrosive and hazardous wastes." *Id.* at 774. *See also id.* at 783 ("The action memoranda reveal that before the drums were stabilized EPA was concerned with the risk of fire and explosion,

tornadoes, exposure of nearby residents, and the environment to the hazardous substances, and the release of contaminants to the soil. These threats, and EPA's concern, *continued even after completion of the drum stabilization. According to EPA, the mere presence of the drums posed threats of fire and explosion and release of hazardous substances to nearby residents.*") (emphasis added); *id.* at 784 ("In sum, the Court finds that the EPA appropriately performed the response action as a series of removal actions to mitigate the imminent threat posed by the leaking drums. The administrative record adequately documents the continuing risk to human health and the environment of the drummed wastes."); *Arkansas Peace Center v. Arkansas Dept. of Pollution,* 8th Cir., 999 F.2d 1212, 1214 (1993) ("The memorandum emphasized in several statements the risk of exposure to nearby populations...."); *id.* at 1214 ("The EPA overpacked the drums and placed them in temporary storage to mitigate hazards the deteriorating drums posed.").

**107.** *Vertac,* 33 F.Supp.2d at 772.

**108.** *New Castle County,* 685 F.Supp. at 1332.

estate," and that therefore the incineration "restored the damaged property of a third party, Vertac, even though (as is usually the case with repair of existing property damage) it had the collateral effect of preventing further third-party injury." Hercules also claims that "[O]nce the materials in the Vertac drums and the soils those drums had contaminated were double-packed into the secure Vertac barrels and warehoused, any threat of leaking or causing further third party property damage was eliminated."

These arguments are at odds with the undisputed facts. As demonstrated above, the EPA cleanup for which the United States has sought to hold Hercules liable was overwhelmingly—not collaterally—concerned with removing the danger of future harm to nearby populations posed by the conglomeration of barrels.[109] It was certainly not a matter of restoring the soil in the barrels, as Hercules argues. Based on the undisputed facts, any restorative effect to third-party property was incidental to the preventative purposes of the incineration.

### Home Defense Costs

■ In its Post, Post–Trial Opinion, the Superior Court held that Home is not required to cover Hercules' defense costs.[110] The Superior Court relied on the plain language of Home's Ultimate Net Loss provision, which defines Ultimate Net Loss as:

> the amount payable in settlement of the liability of the Insured after making deductions for all recoveries and for other valid and collectible insurances, excepting however the policy(ies) of the Primary Insurer(s) and shall exclude all expenses and Costs.

"Costs" are defined as:

> interest accruing after entry of judgment, investigation, adjustment and legal expenses (excluding, however, all office expenses of the Insured, all expenses for salaried employees and general retainer fees for counsel normally paid by the Insured).

Hercules argues that this language is ambiguous, because it appears to exclude legal expenses from coverage, but then, by virtue of the parenthetical exception in the definition of costs, includes as covered general retainer fees for legal counsel and other expenses. Hercules argues that the exclusion of "legal expenses" and the inclusion of "general retainer fees for counsel normally paid by the Insured" are in conflict, and that the provisions must be read in its favor to include defense costs.[111]

---

109. *See Vertac*, 33 F.Supp.2d at 772 ("EPA determined that the wastes on the site posed a threat to public health and welfare and the environment. Resident in the area could be exposed to hazardous substances and should a large release occur, in the event of a tornado, fire, or continued poor maintenance, the toxic waste would contaminate the environment."); *id.* at 773–73 ("The Regional Administrator determined that immediate federal removal action was necessary to complete the incineration and there was the risk of exposure to the population by the threat of release, fire or explosion if the waste was not incinerated."); *see also New Castle County*, 685 F.Supp. at 1332 (excluding coverage for sums spent to clean landfill to prevent escape of contaminants).

110. The Superior Court implicitly rejected Hercules' argument that the Home policy follows form to the LMI policy and must provide the same coverage that the LMI policy would provide. We hold that the Home policy does not incorporate by reference the same terms as the LMI policy with respect to defense costs. Rather, by its terms, "the Home policy controls Home's obligations if there is any conflict between the two insuring agreements." *Home Ins. Co. v. American Home Products*, 2d Cir., 902 F.2d 1111, 1113 (1990).

111. Hercules does not embrace a reading of the provision that would simply provide coverage for "general retainer fees," perhaps because, in the language of the provision itself, all agree that such fees are "normally paid by

Hercules argues that an interpretation that flatly excludes defense costs necessarily disregards the parenthetical, instead of properly giving effect to all of the language in the insurance contract.

We have concluded that the under the plain language of the provision at issue there is no coverage for the defense costs sought by Hercules. This is a result supported by substantial authority. In *Continental Casualty v. Pittsburgh Corning Corp.*,[112] the Seventh Circuit explained that the seeming inconsistency in the language is "easily solved" by reading the parenthetical not as an exception to the exclusion, but as a result of "modular" drafting of insurance contracts by virtue of which not just outside "legal expenses" but also associated in-house legal expenses are excluded.[113] Interpreting identical language, the Second Circuit has likewise held, "We agree with Home's interpretation that post-judgment interest and legal expenses

(in particular outside counsel fees) are excluded under the plain language of the policy."[114] We are persuaded by the analysis in these cases that the defense costs are not covered.

■ We are not persuaded by Hercules' attempt to create ambiguity in the provisions at issue. An ambiguity exists when the contractual provisions are "reasonably or fairly susceptible" of different interpretations or two different meanings.[115] Both interpretations must be reasonable.[116] The provision at issue is not a model of drafting. Nevertheless, the only reasonable interpretation of the language is that it excludes coverage for defense costs.

The argument that the provisions are inconsistent appears to rest on the premise that the excluded "legal expenses" and the seemingly included "general retainer fees" are the same or substantially the same set of expenses.[117] Hercules offers an alterna-

---

the Insured" and Hercules did not contract otherwise. In any event, Hercules seeks coverage for "defense costs" without qualification, not merely some subset of costs defined as "general retainer fees."

**112.** *See Continental Casualty Co. v. Pittsburgh Corning Corp.*, 7th Cir., 917 F.2d 297, 298–99 (1990).

**113.** *Id.* at 299. Thus, in contracts where the insured purchased coverage for legal expense, the exclusion was intended to limit coverage by allocating inhouse legal costs to the insured. But where, as in this case, legal expenses are excluded, the parenthetical does not provide coverage for those inhouse costs. *See id.*

**114.** *Home Ins. Co. v. American Home Products*, 2d Cir., 902 F.2d 1111, 1114 (1990).

**115.** *Rhone–Poulenc Basic Chems. Co. v. American Motorist Ins. Co.*, Del.Supr., 616 A.2d 1192, 1196 (1992).

**116.** *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, Del.Supr., 700 A.2d 127, 130 (1997) ("We conclude that the policy language at

issue is ambiguous. Both sides offer reasonable, though problematic, interpretations of provisions that lack consistency and specificity.").

**117.** *See Continental Casualty*, 917 F.2d at 298–99 ("But the parenthetical, to begin with it, carves out of 'legal expenses' the expense of 'retained counsel,' and most of the defense costs incurred by defendants... are the legal fees of the counsel whom they have 'retained' to defend them.... Yet if the term 'retained counsel' is read as broadly as this, the exclusion of 'legal expenses' from the coverage of the policy will have no force, since there are few legal expenses that cannot be fitted within 'all expense for retained counsel of the insured.'"); *Affiliated FM Ins. Co. v. Owens–Corning Fiberglas Corp.*, 6th Cir., 16 F.3d 684, 687 (1994) (stating that it is "incongruous" to carve out expenses for retained counsel from the exclusion for legal expenses). *Cf. id.* ("The parenthetical does not contradict the other provision in the policy but it nevertheless creates an ambiguity."); *Rohm and Haas Co. v. Continental Cas. Co.*, Pa. Ct. C.P., No. 3449, slip. op. at 8, Jaffe, J. (Philadelphia County, Dec. 30, 1996).

tive reading of the provision in order to deal with this perceived inconsistency. Under its alternative, the "Ultimate Net Loss" provision determines whether the coverage falls within the "Ultimate Net Loss" limits. Hercules argues that "only 'Ultimate Net Loss' payments—that is, settlements or judgments, exhaust the limits of the Home policy," whereas "expenses and costs are covered outside of the Home policy's Ultimate Net Loss limits, except for Hercules in-house costs and general retainer fees that *are not covered.*" Thus, some legal expenses are covered but do not erode the policy limits, but general retainer fees are not covered at all.

Hercules offers no convincing support for its reading in the terms of the contract itself.[118] There are cases that support Hercules' position that the language is ambiguous, and which consequently find coverage, but those cases do not embrace its alternative interpretation of that language.[119] We find that Hercules' interpretation makes little sense. For example, it presupposes a practical distinction between "legal expenses" and "general retainer fees." Hercules argues that latter are not covered at all and the former are covered outside the "Ultimate Net Loss" limits. If this distinction is a sound one, however, as explained above there is no ambiguity in the provision to begin with: it simply defines costs as including "legal expenses" and excluding "general retainer fees." Under this reading, there is no need to posit that the provision does not have to do with coverage. In any event, as

noted above, Hercules is not seeking "general retainer fees" (or, for that matter, "expenses for salaried employees," which are also addressed in the parenthetical.)

Furthermore, Hercules' explanation of the parenthetical is inconsistent with its focus on ultimate net loss limits. As noted above, it proposes that the costs in the parenthetical are not covered at all. But it could just as easily be argued that the costs excluded in the parenthetical *are* covered but are treated differently simply in that they *are* subject to the Ultimate Net Loss limits. Hercules' argument, after all, is that the definition of costs operates not to create or deny coverage but to determine whether limits are eroded. Under this theory (which we reject based on the plain language of the provision), a natural reading of the parenthetical would be that the "general retainer fees" are covered, and are treated differently only in that they do erode the policy limits. Yet, Hercules reads the parenthetical as an exclusion of coverage.[120]

Hercules has not advanced a coherent interpretation of the provision at issue sufficient to create ambiguity. As explained above, the only reasonable interpretation of the language is that defense costs are not covered.

### *Prejudgment Interest*

██ In its Post–Trial Opinion, the trial court held that prejudgment interest did not begin to accrue until Hercules filed its comprehensive coverage action in October 1992. The trial court held that the pay-

---

118. *See Home Ins.,* 902 F.2d at 1114 (rejecting identical argument, noting that "[t]here is no explicit support in the text of the Home policy for AHP's construction of this key definition").

119. *See Affiliated FM,* 16 F.3d at 687 ("[R]emand[ing] for consideration of extrinsic evidence as to the parties' intent regarding coverage of defense costs. . . ."), *Rohm and Haas Co. v. Continental Cas. Co.,* Pa. Ct. C.P., No.

3449, slip. op. at 7, 8, Jaffe, J. (Philadelphia County, Dec. 30, 1996) (finding "the policy language to be inconsistent" and construing against the insurer "in the absence of clear and convincing evidence to the contrary").

120. Again, Hercules appears to be struggling to avoid a reading under which, for example, employee salaries are covered.

ment was not due until actual demand was made.[121] The trial court concluded that no demand was made until the complaint was filed.

Hercules argues that sufficient "notice" was given to insurers before that time and that interest accrues "after Hercules had given notice to its insurers, exhausted its $2 million dollar self-retention, and exhausted any underlying coverage for a particular year." Hercules argues that this occurred between 1984 and 1987 for the various policies.[122] Hercules argues, in essence, that an explicit request for payment was not required in this case and that its notices were sufficient. Its "notice" argument is based on various letters sent to the excess insurers through its broker. Some of these notices provide updates on pending litigation and provide cost estimates. Some of them state that there is "reason to believe the claims were of such a magnitude that your policies could be implicated" and further state, "Kindly direct your acknowledgment and coverage determination to my attention as soon as possible." None of them makes a request for payment of any sum.

 A party is entitled to prejudgment interest running from the date payment is due.[123] The determination of the date when payment is due is a matter of law subject to plenary review.[124] "Where the underlying obligation to make payment arises *ex contractu*, we look to the contract itself to determine when interest should begin to accrue."[125] In *Citadel*, a case involving advancement of funds to a former director of a corporation under an indemnification agreement with the corporation, we held that "[u]nder this contractual scenario" interest should accrue "from the date of demand." We noted that date to be the "date when [the director] specified the amount of reimbursement demanded and produced his written promise to repay."[126]

Although Hercules sent various forms of notice regarding potential liability, Hercules does not contend that it ever made a demand. In its Reply Brief it argues that an explicit request for payment is not required, and that "the facts in *Citadel* do not establish a rule of law that applies... when different contract provisions apply." This argument must fail. In this case, as in *Citadel*, no payment was due until Hercules made an unequivocal request for payment.[127] The trial court found that "Hercules consistently corresponded with Defendants with respect to its potential, and building liability" and that Hercules

---

**121.** In this connection, the trial court also found that "Loss Payable" clauses in the policies require a "definite demand." We do not address whether reliance on this clause was proper in the context of calculating prejudgment interest. Since no demand was made until the complaint was filed, *Citadel* controls and the application of this policy language is unnecessary.

**122.** In addition to rejecting this argument on the ground that no demand had been made by this point, the trial court reasoned that Hercules could not choose these dates as the date of defendant's breach for the purposes of calculating interest yet choose a later date for the purpose of tolling the three-year statute of limitations in contract cases. The trial court reasoned that if breach occurred in 1986 then

Hercules' complaint filed in 1992 would be time-barred. Because we agree that no demand was made for the purposes of accruing interest until the complaint was filed, we do not need address to this issue.

**123.** *See Citadel Holding Corp. v. Roven,* Del. Supr., 603 A.2d 818, 826 (1992).

**124.** See id.

**125.** *Id.*

**126.** *Id.* at 826, 826 n. 10.

**127.** *See also Ripsom v. Beaver Blacktop, Inc.,* Del.Super., 1998 WL 32071, \*22, Poppiti, J. (April 6, 1988) (ORDER) (choosing the date

notified its insurance broker and certain defendants of liability actions filed against Hercules in the 1980s.[128] The trial court held that "it is not clear at what point" the policies attached and that it was only with filing of the complaint that the insurers "undeniably knew that Hercules was making a claim and undeniably decided not to pay." [129] Hercules points to nothing in the record that suggests that this view was in error. We hold that in this case payment cannot be said to have been due until Hercules made a request for payment.

### Allstate's Cross–Appeal Concerning Denial of Attorney's Fees and Costs

■ Allstate Insurance offered to settle with Hercules for $5,000. Hercules rejected the offer, and Allstate was subsequently dismissed from the suit. Allstate now seeks to recover costs and attorneys fees under Superior Court Civil Rule 68.[130]

■ Allstate's argument must fail. Rule 68 does not authorize an award of costs unless the plaintiff obtains a judgment that is "not more favorable" than the offer. In *Delta Air Lines, Inc. v. August*,[131] the United States Supreme Court ruled that where, as here, the plaintiff obtains *no* judgment from the defendant seeking costs (*i.e.*, judgment is for the defendant), Rule 68 does not apply.[132] This is true even when the plaintiff obtains a judgment from defendants other than

an amended complaint was filed to determine when interest began to accrue; citing cases supporting this view); *Cf. Moskowitz v. Mayor and Council of Wilmington*, Del.Supr., 391 A.2d 209, 211 (1978) ("The prevailing rule in those jurisdictions permitting recovery of interest, which we adopt, is that interest is awarded from the date the taxpayer gave notice to the governmental entity that the taxpayer considered the tax payment unlawful or improper. The rationale underlying this rule is that money is not due and payable, and thus not in default, until there has been a demand therefore.") (citations omitted).

**128.** Post–Trial Opinion, at 21.

**129.** Hercules argues that the trial court erroneously required Hercules to make a demand for a "sum certain." This issue is not before us, however, since Hercules did not make *any* request for payment.

**130.** Rule 68 provides:
At any time more than 10 days before the trial begins a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the Clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer. The fact that an offer is made but not accepted does not preclude a subsequent offer. When the liability of one party to another has been determined by verdict or order or judgment, but the amount or extent of the liability remains to be determined by further proceedings, the party adjudged liable may make an *offer of judgment*, which shall have the same effect as an offer made before trial if it is served within a reasonable time not less than 10 days prior to the commencement of hearings to determine the amount or extent of liability.

**131.** 450 U.S. 346, 350–56, 101 S.Ct. 1146, 67 L.Ed.2d 287 (1981).

**132.** *Id.* at 350–56, 101 S.Ct. 1146. The federal rule is identical to Delaware's. *See also Roberts v. Bullard*, Del.Super., C.A. No. 96C–02–089–VAB, Quillen, J., 1998 WL 960701 (Dec. 22, 1998). Unless there is "good reason" to adopt a contrary construction, it is desirable to follow the interpretation placed upon the Rule by the federal courts. *See*

the one whose offer is rejected.[133] Even if Rule 68 were to apply, it does not authorize recovery of attorneys fees.[134]

### *Conclusion*

The ruling of the trial court applying modified pro rata allocation to determine liability is reversed, and the Final Judgment Order is vacated. We affirm the rulings of the trial court on all other issues. This case is remanded for further proceedings consistent with this Opinion.

---

*Cebenka v. The Upjohn Co.*, Del.Supr., 559 A.2d 1219, 1225 n. 17 (1989).

**133.** *Louisiana Power & Light Co. v. Kellstrom*, 5th Cir., 50 F.3d 319, 333–34 (1995), cert. denied sub nom. *L.K. Comstock & Co. v. Louisiana Power & Light Co.*, 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 113 (1995).

**134.** *See, e.g., Big Yank Corp. v. Liberty Mutual Fire Ins. Co.*, 2d Cir., 139 F.3d 325, (1998) (holding that "the rule only provides for an award of costs and not for an award of attorneys fees"); 13 Moore's Federal Practice § 68.02[4] (3d. ed.1999) ("If no exception to the American Rule applies, neither an offeree's acceptance of a Rule 68 offer including 'costs then accrued' nor a rejection followed by a failure to win a more favorable judgment... can create any entitlement to or liability for an attorney-fee award.").