# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CALVITTI POOLS & SPAS, INC., d/b/a BLUE HAVEN POOLS & SPAS,<br><br>Plaintiff,<br><br>v.<br><br>STEPHANIE PATTON and ROBERT PATTON,<br><br>Defendants. | C.A. No. 2025-0595-CDW |

## REPORT DENYING MOTION TO TRANSFER AND GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS

Date Submitted: January 2, 2026
Date Decided: April 21, 2026

William B. Larson, Jr., Jalen S. Frantal, MANNING GROSS + MASSENBURG LLP, Wilmington, Delaware; *Counsel for Plaintiff*

M. Edward Danberg, THE DANBERG LAW FIRM LLC, Newark, Delaware; *Counsel for Defendants*

**WRIGHT, M.**

Plaintiff in this action seeks to confirm an arbitration award it won against defendants arising out of a construction contract for a swimming pool. Defendants say the case belongs in the Court of Common Pleas because the contract is a consumer credit contract and the Delaware Uniform Arbitration Act vests that court with exclusive jurisdiction to hear arbitration-related claims involving such contracts. This report resolves defendants' motion to transfer and plaintiff's motion for judgment on the pleadings. I recommend the court deny defendants' motion to transfer and grant plaintiff's motion for judgment on the pleadings.

## I.    BACKGROUND

The facts are straightforward. Plaintiff is a business that builds and designs residential swimming pools.[1] Defendants are married to each other and reside in Middletown, Delaware.[2] On June 8, 2022, plaintiff began constructing a swimming pool on defendants' property, in accordance with an executed contract ("Pool Contract").[3]

---

[1] *See generally* Verified Compl. to Confirm Arbitration Award ("Compl."), Dkt. 1; Dkt. 1 Ex. A at 1 ("Pool Contract").

[2] Compl. ¶ 2.

[3] Pool Contract 1.

## A.     The Contracts

The Pool Contract is, in part, an order form which contains the specific details for the design and construction of the pool.[4]  The Pool Contract lists both defendants' names and refers to them collectively as "Buyer."[5]  Under the Pool Contract, Buyer agreed to full cash payment to be made at three different progress periods.[6]  The order-form side of the Pool Contract also contains a "holder rule" notice, which states that "any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereof.  Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder."[7]

On the flip-side of the Pool Contract are its terms and conditions.[8]  Paragraph 12 of the terms and conditions is the "Payment" term and gives plaintiff the right to discontinue its performance if timely payment is not made.[9]

---

[4] *See id.*

[5] *See id.* ("Name Stephanie and Robert Patton (hereinafter referred to as 'Owner or Buyer' and sometimes collectively referred to as 'Buyer') enter into this Swimming Pool Contract 'Contract'").  The Pool Contract only bears Robert Patton's signature. *See id.*

[6] *Id*. ("Buyer agrees to pay the total cash price of this contract, less deposit at the following intervals ad in the percentages stated below[.]").

[7] *Id.*

[8] *See id.* 2.

[9] *Id.*

Paragraph 13 dictates what constitutes a default by either party.[10] Paragraph 19 is an arbitration provision which states that claims must be brought in arbitration held in Montgomery County, Pennsylvania.[11] Paragraph 20 contains a non-disparagement provision and a severability provision.[12]

Plaintiff and Buyer also executed a separate arbitration agreement with the Pool Contract ("Arbitration Agreement").[13] Through this agreement, plaintiff and Buyer agreed to arbitrate two sets of claims. First, they agreed to arbitrate "any controversy, action, dispute, breach or question relating to or arising out of the swimming pool contract and [plaintiff]'s construction of [B]uyers' swimming pool[.]"[14] Second, they agreed to arbitrate "the validity of a complaint before any party may publish a complaint on any form of social media, [F]acebook, [Y]elp or any other internet site which registers complaints or comments about contractors and others."[15]

Defendants aver they received financing from a third party.[16] Plaintiff admits it referred defendants to a third-party lender to assist with financing the

---

[10] *Id.*

[11] *Id.* The Pool Contract does not contain a choice-of-law provision.

[12] *Id.*

[13] *See* Dkt. 1 Ex. B ("Arb. Agreement"). Like the Pool Contract, Robert Patton is the only signatory between the defendants on the Arbitration Agreement.

[14] *Id.* ¶ 1.

[15] *Id.* ¶ 2.10.

[16] *See* Mot. to Transfer for Lack of Jurisdiction to Ct. of Common Pleas Pursuant to 10 *Del. C.* § 5702(d) ("Mot. to Transfer"), Dkt. 14 at 6 n.1 ("Defendants do not

transaction.[17] But plaintiff maintains that it "is not a party to any credit or loan agreements."[18]

## B.    The Arbitration

Sometime during construction of the swimming pool, the parties had disagreements over the work. Plaintiff maintains it "complete[d] the pool layout and the concrete application of shell" and reached "a point of 95% completion for the entire project."[19] At this point, plaintiff alleges defendants refused to pay their outstanding balance of $108,000 and "prohibited [p]laintiff from entering their property and completing the pool construction[.]"[20]

On November 14, 2023, plaintiff commenced arbitration through the American Arbitration Association against both defendants.[21] Defendants retained joint counsel and together filed counterclaims against plaintiff, which the arbitrator found were "limited to breach of contract and negligent misrepresentation."[22] Defendant Stephanie Patton contested her inclusion in

---

contend that Plaintiff itself financed the pool construction contract. However, the Defendants have no knowledge of the relationship between the Lender and the Plaintiff beyond the Plaintiff's referral of the Defendant to the Lender for the loan.").

[17] *See* Pl.'s Br. in Opp'n to Def.'s Mot. to Transfer ("Transfer Opp'n") at 4 ("In essence, a third party provided the credit, while Plaintiff provided the construction services.").

[18] *Id.*

[19] Compl. ¶ 13.

[20] *Id*. ¶ 14.

[21] *Id*. ¶ 15.

[22] Dkt. 1 Ex. C ¶ 33.

the action and argued that she was not bound by the Pool Contract or the Arbitration Agreement.[23]   On March 11, 2025, the arbitration hearing occurred.[24]   Both defendants testified on issues of the Pool Contract's performance.

On April 14, the arbitrator issued his decision.[25]   The arbitrator found both defendants were bound by the Pool Contract and the Arbitration Agreement.[26]   The arbitrator found "[t]he [Pool Contract] and appurtenant agreements are valid and enforceable and were in full force and effect at all material times."[27]

The arbitrator addressed defendants' arguments in his decision.[28]   The arbitrator concluded "[defendants] . . . failed to demonstrate that their refusal to allow [plaintiff] to complete the work under the [Pool Contract] was

---

[23] *See id*. ¶ 35.

[24] *Id*. at 1.

[25] *Id*. at 5.

[26] *See id*. ¶¶ 4 ("The [Pool Contract] and [Arbitration Agreement] were signed only by Robert Patton, but Respondents essentially admit the existence of a valid contract in their Answer to Claimant's Complaint filed in this arbitration; nowhere in their Answer or affirmative defenses, or indeed at any time prior to their post-hearing Brief, do Respondents deny the existence of a contract that was valid and enforceable as to both of them."); 5 ("At no time did Stephanie or Robert Patton contend that [the Pool Contract] was not effective to bind them or [plaintiff], and at all relevant times, the Pattons' conduct was consistent with a belief on their part that the [Pool Contract] was valid and effective.").

[27] *Id*. ¶ 15.

[28] *See id*. ¶¶ 9–10, 17, 21–35.

justified[.]"[29]   The arbitrator also held that defendants' "refusal to make payment to [plaintiff] as prescribed in the [Pool Contract] amounted to a breach of the [Pool Contract], and that [plaintiff] is therefore entitled to recover against [defendants] on its claim-in-chief."[30]   The arbitrator also determined that defendants' counterclaims failed.[31]   Finally, the arbitrator awarded plaintiff "$108,100.00 for the balance due under the [Pool Contract] and $25,944 in interest on the principal amount, for a total Award of $134,044.00."[32]

## II.   PROCEDURAL POSTURE

On May 29, 2025 plaintiff filed the Verified Complaint to Confirm Arbitration Award.[33]   Defendants answered the complaint on September 15.[34]   On October 8, plaintiff moved for judgment on the pleadings to confirm the arbitration award.[35]   On November 24, before answering the motion for judgment on the pleadings, defendants moved to transfer for lack of subject

---

[29] *Id.* ¶ 32.

[30] *Id.*

[31] *Id.* ¶ 34.

[32] *Id.* ¶ 35.

[33] Dkt. 1.

[34] Dkt. 7.

[35] Dkt. 9.

matter jurisdiction to the Court of Common Pleas.[36]  Briefing on both motions

was completed by January 2, 2026.[37]

### III.  ANALYSIS

Two motions are pending.  The first is plaintiff's motion for judgment on

the pleadings; the second is defendants' motion to transfer the action to the

Court of Common Pleas.  Because subject matter jurisdiction is a threshold

determination,[38] I begin with the motion to transfer.

### A.  The Motion to Transfer

Defendants move to transfer this action to the Court of Common Pleas

under Title 10, Section 5702 of the Delaware Code.  They argue that the Pool

Contract's inclusion of a "holder rule" notice means that it is a "consumer

credit contract" as defined by Title 16, Section 433.1 of the Code of Federal

Regulations.[39]  They contend that because the Pool Contract is a "consumer

credit contract" as defined by Section 433.1, this action must be transferred to

the Court of Common Pleas under Title 10, Section 5702(d).[40]

Defendants' argument boils down to this:  (1) the Pool Contract includes

a "holder rule" notice which labels it a "consumer credit contract"; (2) because

---

[36] Dkt. 14.

[37] Dkt. 30.

[38] *In re Doehler Dry Ingredient Sols., LLC*, 2022 WL 4281841, at *3 (Del. Ch. Sep. 15, 2022).

[39] Mot. to Transfer ¶ 12.

[40] *Id*. ¶¶ 16–19.

the contract labels itself a "consumer credit contract," it should fall within Section 5702(d)'s conferral of jurisdiction to the Court of Common Pleas. Defendants also assert that plaintiff referred them to a lender to finance the transaction.[41]  This seems to be defendants' hook in arguing that the Court of Common Pleas rightfully holds jurisdiction over this action.[42]

Plaintiff responds by arguing that Section 5702 "places jurisdiction in the Court of Common Pleas only for 'a contract to provide consumer credit.'"[43] Plaintiff asserts that the "holder rule" notice in the Pool Contract is a "boilerplate shield" that is "required by federal regulation in contracts where a seller refers a buyer to a lender."[44]  Plaintiff concedes the existence of third-party financing; it admits that "a third party provided the credit, while [p]laintiff provided the construction services."[45]  Plaintiff maintains, however, that it "is not a party to any credit or loan agreements."[46]  It argues that the inclusion of a "holder rule" notice "does not legally transform a cash construction contract into an instrument of credit."[47]

---

[41] *Id.* at 6 n.1.

[42] *See id.*

[43] Transfer Opp'n 4 (quoting 10 *Del. C.* § 5702(d)).

[44] *Id*. 5 (citing 16 C.F.R. § 433.2).

[45] *Id*. 4.

[46] *Id.*

[47] *Id*. 5.

The success of the motion to transfer depends on the court's interpretation of the Pool Contract, the Arbitration Agreement, and Title 10, Section 5702(d) of the Delaware Code.

## 1.      Standards of Interpretation

Under Section 5702(d):

> [A]ll actions arising from an arbitration agreement in or relating to a contract to provide consumer credit, and the making of such an agreement to arbitrate issues arising from the extension of consumer credit shall confer jurisdiction on the Court of Common Pleas, and not the Court of Chancery, to enforce the agreement and to enter judgment on an award. Any action brought under this Chapter 57 of this title relating to an agreement to arbitrate issues arising from the extension of consumer credit filed in the Court of Chancery shall not therefore be dismissed, but shall be transferred to the Court of Common Pleas for resolution there as though filed originally in that Court.

10 *Del. C.* § 5702(d). Both parties correctly note that the statute has no defined terms, and that case law on its interpretation is scant. In any event, I find the section clear and unambiguous and not applicable to the contracts here.

"The 'most important consideration for a court in interpreting a statute is the words the General Assembly used in writing it.' The court must 'give the statutory words their commonly understood meanings.'" *Salzberg v. Sciabacucchi*, 227 A.3d 102, 113 (Del. 2020) (first quoting *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 950 (Del. Ch. 2013); and then

quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 230 (Del. 1982)). Additionally, "[c]ourts do not resort to other statutes if the statute being construed is clear and unambiguous.'" *Id.* at 118 (quoting 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51:1 (7th ed.)). "A statute is ambiguous if 'it is reasonably susceptible of different conclusions or interpretations' or 'if a literal reading of the statute would lead to an unreasonable or absurd result not contemplated by the legislature.'" *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del. 2007) (quoting *Newtowne Vill. Serv. Corp. v. Newtowne Rd. Dev. Co.*, 772 A.2d 172, 175 (Del. 2001)).

Under Section 5702(d), the Court of Common Pleas has jurisdiction over "all actions *arising from* an arbitration agreement *in or relating to* a contract *to provide consumer credit*[.]" 10 *Del. C.* § 5702(d) (emphasis added). This language is not reasonably susceptible of differing interpretations.[48] First, for an action to "arise from" an arbitration agreement, the arbitration agreement must be the source or origination of the action.[49] Second, the use of "in or relating to" means that the arbitration agreement must be either (1) a provision

---

[48] Defendants did not argue that a literal reading of Section 5702(d) would lead to an unreasonable or absurd result not contemplated by the General Assembly.

[49] *Arise*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/arise (last visited April 21, 2026).

within "a contract to provide consumer credit[,]" or (2) be connected to "a contract to provide consumer credit[.]"[50]

"Consumer credit" is a term that refers to the extension of credit by a creditor specifically to "a natural person" if the credit goes towards an underlying "money, property, or services" transaction that is "primarily for personal, family, or household purposes."[51] Essentially, a consumer credit is a credit issued to a natural person for personal, non-business purposes.[52] To provide consumer credit, then, would be to issue credit to a natural person to assist in financing a qualified transaction by that person, *i.e.*, be the creditor in a creditor-debtor relationship.[53]

---

[50] *Relate to*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/relating%20to (last visited April 21, 2026) (defining "relate to" as "to connect (something) with (something else)"); *see also Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1083 (Del. Ch. 2021) ("Our courts have considered the connector 'relating to' to be paradigmatically broad. Compared to the phrase 'arising out of,' the term 'related to' is typically defined more broadly and is not necessarily tied to the concept of a causal connection.") (citation modified).

[51] 15 U.S.C. § 1602(i); *see also Consumer Credit*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/consumer%20credit (last visited April 21, 2026) ("[C]redit granted to an individual especially to finance the purchase of consumer goods or to defray personal expenses[.]").

[52] *See* DEE PRIDGEN & JOLINA C. CUARESMA, CONSUMER CREDIT & THE LAW § 1:1 (updated Nov. 2025) ("Generally, there are three types of traditional consumer credit: * * * [1] *Closed-end.* Examples of closed-end credit include auto loans and mortgages. * * * [2] *Revolving Credit. . . .* Credit cards and home equity lines of credit (HELOCs) are types of revolving credit; and * * * [3] *Open credit. . . .* Charge cards are a type of open credit.") (emphasis in original); *see also* 15 U.S.C. § 1602(f) ("The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.").

[53] *See id.* ("There are two types of lenders in the consumer credit market: banks and nonbanks. The banking sector comprises traditional depository institutions such as

Putting that all together, under Section 5702(d), the Court of Common Pleas has jurisdiction over all actions originating from an arbitration agreement that is either: (1) contained within a contract between a creditor and a qualified debtor to issue credit to the debtor; or (2) connected to such a contract. Now, I apply this standard to the Arbitration Agreement and Pool Contract to determine whether this action must be transferred to the Court of Common Pleas.

## 2.      Relevant Statutory and Regulatory Background

The crux of defendants' argument for transfer is that the Pool Contract contains a "holder rule" provision and is thus a "consumer credit contract" as defined by the federal Truth in Lending Act.[54]

Title 16, Section 433.2 of the Code of Federal Regulations states that "it is an unfair or deceptive act or practice within the meaning of section 5 of [the Federal Trade Commission] Act for a seller, directly or indirectly, to:

> (a)     Take or receive a consumer credit contract
> which fails to contain the following provision in at
> least ten point, bold face, type:
>
> **NOTICE**

---

banks, credit unions, and thrifts while the nonbanking sector comprises financial institutions that do not have a depository charter.").

[54] *See* Mot. to Transfer ¶ 12 ("[T]he Contract disclosure necessarily must be read in light of the regulatory definitions. Thus, the Contract disclosure plainly identifies the Contract as a 'consumer credit contract,' one type of which is a 'Purchase Money Loan' as defined in 16 C.F.R. § 433.1") (footnote omitted).

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVER HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

or,

(b)    Accept, as full or partial payment for such sale or lease, the proceeds of any purchase money loan (as purchase money loan is defined herein), unless any consumer credit contract made in connection with such purchase money loan contains the following provision in at least ten point, bold face, type:

**NOTICE**

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

16 C.F.R. § 433.2.[55]  These notices are called "holder rule" notices.  They apply

to consumer purchase money loans and financed sales.[56]  They are "meant to

---

[55] Title 16, Section 433.1 of the Code of Federal Regulations defines "Consumer Credit Contract" as "any instrument which evidences or embodies a debt arising from

- 13 -

prevent anyone who bought the commercial paper from claiming holder-in-due-course status[.]" *Mitchell v. Church*, 2006 WL 2194738, at *1 (Del. Super. July 31, 2006).[57]

Defendants argue the inclusion of a "holder rule" notice makes the Pool Contract a "consumer credit contract" and assigns disputes over it to the Court of Common Pleas.[58] Plaintiff argues that, despite the inclusion of a "holder rule" notice, the Pool Contract is a construction contract, not a consumer credit

---

a 'Purchase Money Loan' transaction or a 'financed sale' as defined in paragraphs (d) and (e) of this section." 16 C.F.R. § 433.1(i). A "Purchase Money Loan" is "[a] cash advance which is received by a consumer in return for a 'Finance Charge' within the meaning of the Truth in Lending Act and Regulation Z, which is applied, in whole or substantial part, to a purchase of goods or services from a seller who (1) refers consumers to the creditor or (2) is affiliated with the creditor by common control, contract, or business arrangement." *Id.* § 433.1(d). A "financed sale" is one that extends "credit to a consumer in connection with a 'Credit Sale' within the meaning of the Truth in Lending Act and Regulation Z." *Id.* § 433.1(e). A "credit sale" is "any sale in which the seller is a creditor." 15 U.S.C. § 1602(h).

[56] 16 C.F.R. § 433.1(i).

[57] "[A] holder in due course is the commercial paper version of a bona fide purchaser." *Dodge v. Wilm. Tr. Co.*, 1995 WL 106380, at *5 (Del. Ch. Feb. 3, 1995). In Delaware, holders in due course are defined by Title 6, Section 3-303 of the Delaware Code. A holder of an instrument is a holder in due course if "[t]he holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an unsecured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contained an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 3-306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 3-305(a)." 6 *Del. C.* § 3-302(a)(2).

[58] *See* Mot. to Transfer ¶¶ 9–13 (arguing that the inclusion of a holder rule notice forces the interpretation that the contract is a "consumer credit contract" as defined by Title 16, Section 433.1 of the Code of Federal Regulations); 14–18 (arguing that the Delaware legislature intended to incorporate the "Federal Regulatory" definition of "consumer credit contract" into Title 10, Section 5702(d) of the Delaware Code).

contract.[59]   The parties' arguments raise a question of the Pool Contract's interpretation.

"When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).  "[C]lear and unambiguous language is 'reasonably susceptible of *only one* interpretation.'"  *BitGo Hldgs., Inc. v. Galaxy Digit. Hldgs., Ltd.*, 319 A.3d 310, 322 (Del. 2024) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)) (emphasis in original).  "Language from a contract need not be perfectly clear for an interpretation of it to be deemed as the only reasonable one."  *Id*. (citing *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 506 (Del. 2001)).  The "more natural" reading is a factor the court must consider, but "[e]ven a 'less natural' reading of a contract term may be 'reasonable' for purposes of an ambiguity inquiry."  *Id*. at 324 (quoting *Bank of N.Y. Mellon v. Commerzbank Cap. Funding Tr. II*, 65 A.3d 539, 550 (Del. 2013)).

### 3.    The Pool Contract Does Not Provide Consumer Credit

In interpreting the Pool Contract, the question is not whether the contract is a "consumer credit contract" as defined by the Code of Federal Regulations.

---

[59] Transfer Opp'n 7.

Instead, the question the motion to transfer asks is whether the Pool Contract is a "contract to provide consumer credit," as stated in Title 10, Section 5702(d) of the Delaware Code. *See* 10 *Del. C.* § 5702(d). I conclude it is not.

As earlier discussed, a contract to provide consumer credit is one in which a creditor issues credit to a debtor for a personal purpose. The Pool Contract does not do this. Instead, it captures a cash transaction for the construction of a swimming pool.[60] The terms and conditions bear no indicia of an extension of credit. Indeed, paragraph 12, entitled "Payment," states that "[i]f a payment is due and has not been made, [plaintiff] may discontinue its performance" and that "[p]ayment when due is a condition precedent to any of [plaintiff]'s obligations."[61] The contract contemplates neither a loan nor a deferral of debt. It is plainly not a purchase money loan, a credit agreement, or an agreement creating a line of credit.[62] It would be unreasonable to interpret the Pool Contract to be one that provides consumer credit.[63]

---

[60] *See* Pool Contract 1 ("**Cash.** Buyer agrees to pay the total cash price of this contract, less deposit at the following intervals and in the percentages stated below[.]") (emphasis in original).

[61] *Id*. 2.

[62] *See supra* note 55.

[63] Indeed, defendants' argument that the mere inclusion of "holder rule" language in the Pool Contract turns it into a consumer credit contract would lead to the absurd result that the Pool Contract would be a consumer credit contract even if defendants used no financing—from anyone—to pay for the pool's construction.

The foregoing establishes that the Arbitration Agreement executed with the Pool Contract is not an arbitration agreement "in or relating to a contract to provide consumer credit."[64] Plaintiff may have referred defendants to a third-party lender to assist with financing the transaction, but that does not mean the Arbitration Agreement connected to the Pool Contract also extends to the third-party financing agreement. The Arbitration Agreement plainly states that it covers any proceeding or issue "relating to or arising out of the swimming pool contract and BHP's construction of buyers swimming pool[.]"[65] The Arbitration Agreement makes no reference to a credit or a credit relationship of any kind. The Arbitration Agreement does not relate to the third-party financing agreement and, therefore, actions arising under the Arbitration Agreement do not implicate the Court of Common Pleas' jurisdiction under Section 5702.

In sum, this action was properly filed in the Court of Chancery. I recommend the court deny the motion to transfer.

**B.      Confirmation of the Arbitration Award**

Plaintiff moves for judgment on the pleadings, seeking to confirm the arbitration award entered in its favor against defendants.[66] "The [c]ourt will

---

[64] 10 *Del. C.* § 5702(d).

[65] Arb. Agreement ¶ 1; *see also id.* ¶ 2.5 (stating "the arbitrator is bound by the provisions of the swimming pool contract").

[66] Dkt. 9.

- 17 -

grant a motion for judgment on the pleadings only where no material issues of fact exist, and the movant is entitled to judgment as a matter of law." *Miller v. Mellor*, 2025 WL 2742485, at *5 (Del. Ch. Sept. 26, 2025) (first citing *Lillis v. AT&T Corp.*, 896 A.2d 871, 879 (Del. Ch. 2005); and then citing Ct. Ch. R. 12(c)).

### 1. The FAA Governs Confirmation

The Arbitration Agreement states that "Pennsylvania law shall govern" "any controversy, action, dispute, breach or question relating to or arising out the Swimming Pool Contract and [plaintiff]'s construction of Buyers swimming pool[.]"[67] Although Pennsylvania law governs the underlying dispute, "judgment may be entered upon the award in accordance with applicable law in any court having jurisdiction thereof."[68] And notably, the Arbitration Agreement's governing law language does address enforcement of an arbitration award. This indicates that the governing law provision does not extend to enforcement of the arbitration award.[69]

---

[67] *See* Arb. Agreement ¶ 1.

[68] *Id*. ¶ 2.9. Jurisdiction is proper in this case because defendants are domiciled in Delaware and this court has subject matter jurisdiction over the confirmation of this arbitration award under Title 10, Section 5702 of the Delaware Code. *See Donaldson v. Progressive Adv. Ins. Co.*, 2022 WL 951260, at *1 (Del. Super. Mar. 29, 2022); 10 *Del. C*. § 5702(a).

[69] *Cf. Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Acct.*, 618 F.3d 277, 294–95 (3d Cir. 2010) (applying Federal Arbitration Act standards to vacatur of an arbitration award despite the arbitration agreement's inclusion of a Pennsylvania choice-of-law provision) ("[T]he arbitration provisions on which Ario

The award is governed by the Federal Arbitration Act ("FAA") because the Arbitration Agreement lacks specific reference to the Delaware Uniform Arbitration Act.[70] Section 9 of the FAA controls the court's confirmation of an arbitration award. It states in relevant part:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.

9 U.S.C. § 9. Accordingly, the court "must grant" confirmation of the arbitration award "unless the award is vacated, modified, or corrected prescribed in sections 10 and 11 of [the FAA]." *Id.*

---

relies strongly imply that they are concerned with only the conduct of the arbitration itself, not judicial enforcement of a resulting award . . . . Reading the last paragraph of the arbitration provisions in this context leads us in the majority to conclude that they address solely the 'rules and procedures' applicable to the conduct of the arbitration, not its enforcement (*i.e.*, the applicable vacatur standards).") (footnote omitted).

[70] *See* 10 *Del. C.* § 5702(c); *Soligenix, Inc. v. Emergent Prod. Dev. Gaithersburg, Inc.*, 2023 WL 4584611, at *2 (Del. Ch. July 17, 2023) (citing *Homsey Architects, Inc. v. Nine Ninety Nine, LLC*, 2010 WL 2476298, at *5 (Del. Ch. June 14, 2010)).

Section 11 of the FAA is not implicated in this action. Instead, defendants object to the arbitration award and seek its vacatur.[71] Under Section 10(a) of the FAA, a court can vacate an arbitration award only:

> (1)  where the award was procured by corruption, fraud, or undue means;
>
> (2)  where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3)  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4)  where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Id*. § 10(a). "[R]eview of an arbitration award is one of the narrowest standards of judicial review in all of American jurisprudence." *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Sec., Inc.*, 953 A.2d 726, 732 (Del. Ch. 2008). Together with Section 11, Section 10 of the FAA provides the "exclusive regime[] for the review provided by the statute[.]" *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 590 (2008).

---

[71] *See* Defs.' Answering Br. in Opp'n to Pl.'s Mot. for J. on the Pleadings, Dkt. 22 at 16. Defendants specifically seek an order declaring the Arbitration Agreement void and rejecting confirmation of the arbitration award. *Id.*

## 2. The Arbitration Award Must be Confirmed

The FAA has an interesting divergence in the limitations periods for moving to confirm versus disputing an arbitration award. As the Third Circuit has explained, the FAA "expressly gives more time to the parties to move for confirmation than to dispute the award." *Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245, 255 (3d Cir. 2020). "While the statute of limitations for confirmation of arbitration awards under the FAA is one year, 9 U.S.C. § 9, the time for moving to vacate or modify the award is three months, *see* § 12." *Id.*[72] "If the party seeking confirmation makes its application after that three-month period elapses, then the opposing party cannot, as a matter of law, assert a § 10 or § 11 ground for vacating, modifying or correcting an award." *Id.* (citing *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 175 (2d Cir. 1984)).

Put another way, under the FAA, the court "must grant" a request to confirm an arbitration award unless the award is vacated, modified, or corrected under Sections 10 or 11 of the FAA. 9 U.S.C. § 9. Those three forms of relief from an arbitration award (vacatur, modification, or correction) are the only things that allow a court to deny confirmation of an arbitration award under the

---

[72] *See* 9 U.S.C. § 12 ("Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered.").

FAA.[73] Those three forms of relief have a three-month statute of limitation which commences upon issuance of the arbitration award. *Id*. § 12. Once that three-month period expires, those forms of relief are unavailable and the court "must grant" confirmation of the arbitration award. *See id*. § 9.

The arbitration award was issued on April 14, 2025.[74] Defendants needed to formally object, under Sections 10 or 11 of the FAA, to confirmation of the award by July 14 for their objection to be legally effective. *See id.* § 12. Instead, they did not purport to seek relief from the arbitration award until they answered the complaint in September.[75] Accordingly, under the FAA, they are prohibited from seeking vacatur, modification, or correction of the arbitration award. *See Teamsters*, 966 F.3d at 255 (3rd Cir. 2020) (citing *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 175 (2d Cir. 1984)). With this established, the court must confirm the arbitration award. 9 U.S.C. § 9.

---

[73] *See id.* § 9 ("[T]he court *must* grant such an order [confirming an arbitration award] *unless* the award is vacated, modified, or corrected *as prescribed in sections 10 and 11 of this title*.") (emphasis added); *see also Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245, 252 (3rd Cir. 2020) ("The FAA explicitly requires that arbitration awards be confirmed. What could be stronger than language that, upon application, a district court 'must grant [a confirmation] order' unless the arbitration award is 'vacated, modified, or corrected.' The Supreme Court tells us that [Section] 9 'carries no hint of flexibility.'") (first quoting 9 U.S.C. § 9; and then quoting *Hall St.*, 552 U.S. at 587).

[74] Dkt. 1 Ex. C at 5.

[75] Dkt. 7.

## IV. CONCLUSION

I recommend that the court deny defendants' motion to transfer because the Pool Contract does not provide consumer credit and the Arbitration Agreement does not relate to a third-party financing agreement. I recommend that the court grant plaintiff's motion for judgment on the pleadings and confirm the arbitration award.

This is a Final Report under Court of Chancery Rule 144(b)(2). Under Court of Chancery Rules 144(d)(1) and 6(a)(1)(C), any party who wishes to file exceptions to this report must file their notice of exceptions by May 4, 2026.